STATE

v.

Paul A. LATRAVERSE.

No. 80–549–C.A.

Supreme Court of Rhode Island.

April 2, 1982.

Dennis J. Roberts, II, Atty. Gen., Joel S. Chase, Sp. Asst. Atty. Gen., for plaintiff.

Denise M. Auger, Cumberland, for defendant.

## OPINION

KELLEHER, Justice.

The defendant, Paul A. Latraverse (Latraverse), was found guilty by a Superior Court justice, after a jury-waived trial, of attempting knowingly and maliciously to dissuade a Woonsocket police officer from giving testimony before a grand jury, a violation of G.L.1956 (1969 Reenactment) § 11–32–5, as enacted by P.L.1980, ch. 91, § 2, better known as the Anti-intimidation of Witnesses and Crime Victims statute.

Salvatore Lombardi (Lombardi) is a member of the Woonsocket police department. As a member of the detective division, he has done undercover work numerous times using the name Frank Torro. As Frank Torro, he had purchased four stolen cars from Latraverse, who owns and operates a Woonsocket used-car dealership. Following the sale, Latraverse was arrested and arraigned in the District Court on several charges of receiving stolen goods. At the time of the incident we are about to describe, Latraverse was free on bail while awaiting the grand jury's consideration of his dealings with "Torro."

On June 26, 1980, Lombardi arrived at his Morton Avenue home sometime between 11 p. m. and midnight after completing a tour of duty. At approximately 1:40 a. m. on June 27, he and his wife were watching a television program when a car with a faulty muffler passed by. The resulting noise caused Lombardi to look out the front window. There on the street he observed a late-model Ford Thunderbird bearing a license plate assigned to Latraverse's automobile agency. Lombardi was aware that the "T-bird" belonged to Latraverse. Once the vehicle had passed by, Lombardi took his walkie-talkie, went outside his home, and secreted himself in the darkness. Lombardi told the trial justice that he kept a vigilant eye on the early-morning traffic

passing by his house because he had received threats as a result of his undercover work. He also testified that on one occasion while working under cover he was asked by Latraverse if his real name was "Salvatore Lombardi."

Lombardi watched the T-bird as it proceeded along Morton Avenue and then took a left onto Bellevue Street, and within a matter of twenty to thirty seconds, he observed the T-bird coming "down" Harrison Avenue. When the vehicle came to a halt, it was parked in front of 203 Harrison Avenue. Its lights were then extinguished. Harrison Avenue runs perpendicular to Morton Avenue and is almost directly across the street from the Lombardi residence. After a wait of a minute or so, Lombardi radioed headquarters for a "backup" because, in his words, he "wasn't going to take any chances" and he "felt" that Latraverse wanted to see him injured. As the backup vehicle came onto Morton Avenue from Hamlet Avenue, its lights were on, and the vehicle was proceeding at forty miles per hour toward the Harrison Avenue-Morton Avenue intersection. As the backup headed toward the intersection, the T-bird backed up on Harrison, made a U-turn, and headed away from the Morton Avenue area toward Park Place. The backup caught up with the darkened T-bird in front of 138 Harrison Avenue.

When the police looked at the interior of the car, they saw the following items: a can of gasoline; a rag; matches; an aluminum baseball bat; a wire coat hanger that had been stretched out so that it could be used to open a car door; and a note that read, "Hi, Sal, know [sic][1] it's my turn asshole."

After the defense had rested without presenting any evidence, Latraverse moved for a judgment of acquittal. Thereafter, the trial justice gave a bench decision in which, after first noting that this court had yet to express itself on the subject of criminal liability for attempting to commit a crime, he referred to several cases in which

---

1. In order to appreciate the full flavor of the note, the word "know" must be read as "now"

because the intended reading was, "Hi, Sal, now it's my turn asshole."

various courts in Connecticut, the District of Columbia, Maine, and Maryland had had their say in regard to whether an accused's conduct fell within the parameters of each jurisdiction's definition of what constituted criminal attempt.

Since the issues presented by Latraverse are those of first impression for this court, we shall briefly detail the evolution of the law of criminal attempt, noting as we proceed the differing views expressed through the years about what are the essential elements of the crime.

Although the criminal law is of ancient origin, the concept that there could be criminal liability for an attempt, even if ultimately unsuccessful, is of comparatively recent origin, beginning with *Rex v. Scofield*, Cald 397 (1784). *See* Sayre, *Criminal Attempts*, 41 Harv.L.Rev. 821 (1928). In *Scofield*, Lord Mansfield observed:

" 'The *intent* may make an act, innocent in itself, criminal; nor is the *completion* of an act, criminal in itself, necessary to constitute criminality. Is it no offence to set fire to a train of gunpowder with intent to burn a house, because by accident, or the interposition of another, the mischief is prevented?' " (Footnote omitted.) 41 Harv.L.Rev. at 834.

The classic elements of a common-law attempt are an intent to commit a crime, the execution of an overt act in furtherance of the intention, and a failure to consummate the crime. *See* 4 Wharton, *Criminal Law* § 741 at 565 (14th ed. 1981). However, this common-law view fails to indicate how far the accused's conduct must proceed toward the actual consummation of the crime in order to be considered an attempt to commit that crime. It is generally agreed that neither the intent to commit a crime nor mere preparation in and of itself constitutes an attempt. The difficulty is to establish a standard that excludes preparation prior to the actual attempt to commit the crime while including as punishable those acts which have reached the point where intervention by the police is justified.

In looking to the tests formulated by the various courts that have sought to distinguish preparation from perpetration, we first look to our northern New England neighbor, Vermont, where "attempt" is defined as an act which "must reach far enough towards the accomplishment of the desired result to amount to the commencement of the consummation." *State v. Boutin*, 133 Vt. 531, 533, 346 A.2d 531, 532 (1975). Again, shortly before the turn of the century in Massachusetts, Mr. Justice Oliver Wendell Holmes, in considering an appeal involving an attempted poisoning, observed that "the act done must come pretty near to accomplishing that result before the law will notice it." *Commonwealth v. Kennedy*, 170 Mass. 18, 20, 48 N.E. 770, 770 (1897). A few years later, when the question was attempted arson, he said:

"[P]reparation is not an attempt. But some preparations may amount to an attempt. It is a question of degree. If the preparation comes very near to the accomplishment of the act, the intent to complete it renders the crime so probable that the act will be a misdemeanor * *." *Commonwealth v. Peaslee*, 177 Mass. 267, 272, 59 N.E. 55, 56 (1901).

The learned jurist also stressed that the arson attempt was complete even though an accused had an opportunity to experience a change of mind. Twenty-four years later Mr. Justice Cardozo in *People v. Werblow*, 241 N.Y. 55, 61, 148 N.E. 786, 789 (1925), expressed the belief that acts performed in furtherance of a criminal project do not reach the stage of attempt unless "they carry the project forward within dangerous proximity to the criminal end to be attained * * *."

Later, in *United States v. Coplon*, 185 F.2d 629, 633 (2d Cir. 1950), Judge Learned Hand, in considering whether the defendant's claim that her conduct "remained in the zone of 'preparation' and that the evidence did not prove an 'attempt,' " rejected a suggested doctrine whereby the crime of attempt would be proved by a showing that the accused had done all that was in his power to do but had been prevented from proceeding further by outside intervention. Judge Hand noted that there were many

decisions in the United States in which the accused had passed beyond preparation even though he had been interrupted before taking the last of his intended steps. This noted jurist found the notion that the instant of consummation could serve as the dividing line between the areas of preparation and attempt to be most unpersuasive.

■ It should be obvious by now that much has been written trying to establish the exact placement of the dividing line where preparation ends and attempt begins, and we have no intention of contributing one whit to what has been described as the preparation-attempt "quagmire."[2] Instead, we adopt the sensible approach to the question now before us embodied in § 5.01 of the American Law Institute's Model Penal Code (Proposed Official Draft 1962) (the code), which reads in part as follows:

"Criminal Attempt.

"(1) *Definition of Attempt.* A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

(b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or

(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(2) *Conduct Which May Be Held Substantial Step Under Subsection (1)(c).* Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the actor's criminal purpose, shall not be held insufficient as a matter of law:

(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime.

"(3) *Conduct Designed to Aid Another in Commission of a Crime.* A person who engages in conduct designed to aid another to commit a crime which would establish his complicity under Section 2.06[3] if

**2.** *United States v. Clay,* 495 F.2d 700, 707 (7th Cir.), *cert. denied,* 419 U.S. 937, 95 S.Ct. 207, 42 L.Ed.2d 164 (1974).

**3.** Section 2.06 of the American Law Institute's Model Penal Code (Proposed Official Draft 1962) deals with the criminal liability imposed on an individual for the acts of another. Our General Assembly has provided for such a con-

tingency with its enactment of G.L.1956 (1981 Reenactment) § 11–1–3, a so-called aiding-and-abetting statute, which imposes criminal liability on anyone who "shall aid, assist, abet, counsel, hire, command, or procure another to commit any crime or offense * * *."

the crime were committed by such other person, is guilty of an attempt to commit the crime, although the crime is not committed or attempted by such other person.

"(4) *Renunciation of Criminal Purpose.* When the actor's conduct would otherwise constitute an attempt under Subsection (1)(b) or (1)(c) of this Section, it is an affirmative defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose. The establishment of such defense does not, however, affect the liability of an accomplice who did not join in such abandonment or prevention.

"Within the meaning of this Article, renunciation of criminal purpose is not voluntary if it is motivated, in whole or in part, by circumstances, not present or apparent at the inception of the actor's course of conduct, which increase the probability of detection or apprehension or which make more difficult the accomplishment of the criminal purpose. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time or to transfer the criminal effort to another but similar objective or victim."

In taking this approach, we follow the path previously taken by our appellate colleagues in the Second[4] and Fifth[5] Federal Circuit Courts of Appeals as well as the Supreme Courts of the States of Ohio[6] and Washington.[7]

It is obvious from a reading of the code that the intent of the drafters was to extend criminal responsibility for attempted criminal behavior by rejecting the defense of impossibility, including the distinction between so-called factual and legal impossibility, and by drawing the line between attempt and noncriminal preparation further away from the final act so as to make the crime essentially one of criminal purpose implemented by an overt act strongly corroborative of such purpose. Wechsler, Jones, and Korn, *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation, and Conspiracy*, 61 Colum.L.Rev. 571, 573 (1961).

■ The defense of impossibility in a prosecution for an attempted crime has been described as a "confused mass of law." *State v. Moretti*, 52 N.J. 182, 188, 244 A.2d 499, 503 (1968). The United States Supreme Court has expressed doubt about the continuing validity of the doctrine of impossibility in the law of criminal attempt. *Osborn v. United States*, 385 U.S. 323, 333, 87 S.Ct. 429, 434–35, 17 L.Ed.2d 394, 401 (1966). When a defendant has done all that he believes necessary to cause a particular result, regardless of what is actually possible under the existing circumstances, it seems to us he has committed an attempt.

The code, with its proviso about an individual who engages in conduct with the purpose of causing a criminal result "with the belief that it will cause such result without further conduct on his part," assigns as criminal liability such conduct as that of the spouse who places a strychnine-saturated glass of milk on the other spouse's night table even though the intended victim for some unknown reason breaks with habit and leaves the glass untouched.

More to the point, however, is the substantial-step clause. Under § 5.01(1)(c) of the code, an attempt occurs when one "purposely does or omits to do anything which * * * is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." To constitute a substantial step, the conduct must be "strongly corroborative of the actor's criminal purpose."

---

4. *United States v. Stallworth*, 543 F.2d 1038 (2d Cir. 1976).

5. *United States v. Mandujano*, 499 F.2d 370 (5th Cir. 1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975).

6. *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059 (1976).

7. *State v. Workman*, 90 Wash.2d 443, 584 P.2d 382 (1978).

The application of this standard will, of course, depend upon the nature of the intended crime and the facts of the particular case. A substantial step in the commission of robbery may be quite different from that in arson, rape, or some other crime, but this standard properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime. In subscribing to the substantial-step doctrine, we endorse the sentiments expressed by Chief Judge Kaufman in *United States v. Stallworth*, 543 F.2d 1038, 1040 (2d Cir. 1976), in which the court, in rejecting the defendants' contention that they could not be convicted of an attempted bank robbery because they neither entered the bank nor brandished weapons, said:

> "We reject this wooden logic. Attempt is a subtle concept that requires a rational and logically sound definition, one that enables society to punish malefactors who have unequivocally set out upon a criminal course without requiring law enforcement officers to delay until innocent bystanders are imperiled."

The code's requirement of a substantial step shifts the emphasis from what remains to be done to what already has been done. Thus, liability for a relatively remote preparatory act is precluded, but at the same time dangerous individuals may be lawfully apprehended at an earlier stage of their nefarious enterprises than would be possible under the approaches subscribed to by the Vermont Supreme Court, Holmes, or Cardozo. *See* Model Penal Code § 5.01, Comment at 47 and 48, (Tent. Draft No. 10 1960).

Parenthetically, we would point out that the substantial-step standard has been adopted legislatively in many states. One example is the State of Connecticut. The Connecticut case cited by the trial justice was *State v. Mazzadra*, 141 Conn. 731, 734, 109 A.2d 873, 875 (1954), where the court listed the two essential elements of a criminal attempt as (1) a specific intent and (2) the commission of some overt act adapted and intended to effectuate that intent. However, the Connecticut Legislature has adopted almost all of the code's article V,

especially the substantial-step test and its accompanying criteria. *See* Conn.Gen.Stat. Ann. § 53a–49, and *State v. Gosselin*, 169 Conn. 377, 379–81, 363 A.2d 100, 102–03 (1975).

Having made our choice concerning the pertinent legal principles, we now turn to the merits of Latraverse's appeal. His argument is simple and straightforward. He argues that in taking the evidence adduced by the state in its best light, his actions in the early-morning hours of June 27, 1980, add up to nothing more than pure preparations that, in turn, must be considered abandoned by his decision to turn around on Harrison Avenue and leave the area.

With all due deference to Latraverse's claim of preparation and/or abandonment, the code's requirement of proof (1) that Latraverse must have been acting with the kind of culpability otherwise required for the commission of the crime he is charged with attempting and (2) that he must have been engaged in conduct which constituted a substantial step toward the commission of the crime emphasizes the importance of the necessity of encouraging early police intervention when a suspect is clearly bent on the commission of crime. There is no necessity that the police had to wait until Latraverse poured the gasoline or struck the match.

The evidence presented before the trial justice indicates that Latraverse had indeed taken substantial steps to effectuate his effort to intimidate Lombardi. There is no question that at 1:40 a. m. on the morning in question he was reconnoitering Lombardi's neighborhood and in the process continued his observation while parked in a darkened automobile 100 feet from the Lombardi household. No one disputes the fact that Latraverse carried with him a homemade tool for unlocking a motor vehicle as well as material that could cause an incendiary episode, and, the most persuasive evidence of Latraverse's intentions to enter Lombardi's property in the early-morning hours of June 27, 1980, his "billet-doux" to Lombardi in which he reminded "Sal" that it was now Latraverse's turn. We have no

hesitancy whatsoever in holding that Latraverse's conduct constituted a substantial step in his endeavor to give Lombardi something to think about as the officer awaited his summons to appear before the grand jury.

The trial justice, rejecting Latraverse's abandonment defense, relied on *Wiley v. State*, 237 Md. 560, 207 A.2d 478 (1965), in which the Maryland Court of Appeals observed that a voluntary abandonment of a criminal attempt that had proceeded beyond mere preparation into an overt act or acts in furtherance of the commission of the attempt does not serve as a defense because the crime has already been committed. We cannot fault the trial justice for his reliance on the legal principles expressed in the *Wiley* case. There is a divergence of opinion about whether or not a defendant can rely upon the doctrine of abandonment after he or she has gone so far as to commit a criminal attempt. The *Wiley* case represents one side. The code expresses a different point of view in that it recognizes as a defense to an attempted crime the abandonment of efforts to commit the crime when circumstances manifest a complete and voluntary renunciation of criminal purpose.

The code stresses that abandonment or renunciation is not complete and voluntary if it is motivated because either (*a*) the defendant has failed to complete the attempt because of unanticipated difficulties, unexpected resistance, or circumstances that increase the probability of detection or apprehension or (*b*) the defendant fails to consummate the attempted offense after deciding to postpone his endeavors until another time or to substitute another victim or another but similar objective. The code's approach to abandonment finds favor with LaFave and Scott, *Handbook on Criminal Law*, § 60 at 450 (1972), and Perkins, *Criminal Law*, ch. 6, § 3 at 590 (2d ed. 1969).

■ Since abandonment is an affirmative defense, Latraverse, if he wishes, has the opportunity and the burden of establishing by a preponderance of the evidence that he in fact voluntarily and completely abandoned his nefarious efforts on the evening in question when he turned around on Harrison Avenue and drove away from Lombardi's home toward Park Place. In placing the burden of abandonment upon the defendant, we perceive no constitutional limitations. Voluntary abandonment, as we view the doctrine, does not negate any element of the offense. Our adoption of the code's approach to abandonment is motivated solely by our belief that our actions are consonant with the purpose of the substantial-step rationale, which recognizes the desirability of early preventive action by the police before a defendant comes dangerously close to committing the intended crime. In like manner, the sole motivation for our recognition of an abandonment defense is the hope that individuals will desist from pursuing their criminal designs, thereby reducing the risk that the intended substantive crime will be accomplished.

Having recognized the abandonment defense, we now afford Latraverse the opportunity to establish by the fair preponderance of the evidence that his departure from Lombardi's neighborhood constituted a voluntary and complete abandonment of his criminal purposes on the evening in question. If this evidentiary hearing is not commenced within ten days of the filing date of this opinion, an order will be entered affirming the judgment of conviction entered in the Superior Court. If he accepts this mandate, the record in this case will be remanded to the Superior Court for a hearing so that the evidence may be presented forthwith to the trial justice for his evaluation. Jurisdiction will be retained by us for further appellate review if such is required.