STATE

v.

Gahlil OLIVEIRA.

State

v.

Victor St. Hill et al.

Nos. 2000–470–M.P., 2000–521–C.A.

Supreme Court of Rhode Island.

Aug. 5, 2005.

Lauren Sandler Zurier, Providence, for Plaintiff.

Catherine A. Gibran, Providence, for Defendants.

Present: WILLIAMS, C.J.,
FLAHERTY, and SUTTELL, JJ.

## O P I N I O N

SUTTELL, Justice.

The defendants, Gahlil Oliveira,[1] Victor St. Hill, and Amita St. Hill, appeal from a judgment of conviction on two charges. A jury found Gahlil Oliveira and Victor St. Hill guilty of the first-degree felony murder of Grady Bolden. The jury also found all three defendants guilty of conspiracy to violate the Rhode Island Controlled Substances Act by unlawfully possessing, selling, or delivering a controlled substance. The trial justice sentenced Gahlil Oliveira and Victor St. Hill to the mandatory life term for their first-degree murder convictions, and a sentence of thirty years (ten to serve, the remainder suspended with probation) for their conspiracy convictions. The trial justice imposed a fifteen-year suspended sentence on Amita St. Hill for her conspiracy conviction.

For the reasons stated herein, we reverse the judgment of the Superior Court with respect to the felony-murder convictions, and affirm the judgment with respect to the conspiracy convictions.

### Facts and Procedural History

The facts of the case pertinent to this appeal are as follows. Shortly before 4 p.m. on March 9, 1995, the Providence police discovered the body of Grady Bolden slumped over the steering wheel of a blue Pontiac Grand Am bearing Connecticut license plates at the corner of Waverly and Sorrento Streets in Providence's West End. The Grand Am had crashed into a parked car, but Bolden had been killed in a hail of gunfire. The right rear window, front passenger window, and driver's side window were shattered, and bullet fragments were found in both the front and rear of the Grand Am. The immediate cause of Bolden's death was a gunshot wound to the right rear side of his head. The police found a loaded Mac 11 semiautomatic machine gun on the rear floor of the car, along with a substantial quantity of ammunition. The police also recovered two Kmart plastic shopping bags on the rear seat of the car containing ammunition for the Mac 11 and a price tag for a backpack. The glove compartment of the car contained a car rental agreement in the name of Horace Green. The police recovered bullet fragments from the adjacent house and yard, and found a .38-caliber revolver on the sidewalk about ten feet away from the Grand Am.

The police contacted Horace Green in Connecticut, and Green voluntarily gave a statement implicating Victor St. Hill (hereinafter Victor) and Amita St. Hill (hereinafter Amita) in a drug conspiracy turned deadly. Green also identified Gahlil Oliveira, from a police photo array, as a participant in the March 9 attempted drug transaction and resulting shootout. In due course, Oliveira and Victor were charged by indictment with one count of first-degree felony murder in violation of G.L.1956 § 11–23–1 (count 1). This count alleged that the two defendants, together with a third unidentified and unindicted individual, murdered Grady Bolden "during the course of the perpetration, or attempted perpetration of felony manufacture, sale, delivery or other distribution of a controlled substance." Count 2 of the indictment charged Oliveira and Victor with one count of conspiring to commit murder in

1. Throughout the record there are various spellings of the defendant Oliveira's first name. Although Oliveira's first name is spelled "Gahill" on both the indictment and judgment of conviction, we chose to adopt the spelling used by the appellate counsel and Oliveira himself in a signed affidavit submitted to this Court.

violation of G.L.1956 § 11–1–6 and § 11–23–1. In addition, Oliveira, Victor and Amita (along with unindicted coconspirators Grady Bolden and Horace Green) were charged with one count of conspiring to unlawfully possess, manufacture, sell, or deliver a controlled substance in violation of G.L.1956 § 21–28–4.08 and § 11–1–6 (count 3).

The first trial on this indictment began in December 1998, and resulted in an acquittal in favor of defendants Victor St. Hill and Gahlil Oliveira on count 2—conspiracy to commit murder—and a hung jury concerning all defendants on the felony murder and drug conspiracy charges.

In October 1999, counts 1 and 3 were tried a second time. Green provided testimony about the events resulting in Grady Bolden's murder in exchange for immunity from prosecution. Green's testimony established a drug conspiracy in which Green played the intermediary between Grady Bolden, who lived in Texas and supplied the cocaine, and the three Providence defendants. According to the state's theory of the case, Victor St. Hill acquired cocaine from Bolden for redistribution in Providence, Gahlil Oliveira provided armed support for Victor's endeavors, and Amita St. Hill provided a meeting place for the other coconspirators and conveyed messages and money related to the purchase of cocaine.

During the trial, Green testified that he was an acquaintance of Grady Bolden, Victor St. Hill, and Amita St. Hill, and that in response to an inquiry from Victor seeking to purchase drugs, he arranged a conference call between himself, Grady Bolden, and Victor. Shortly thereafter, Bolden traveled from Texas to Connecticut and asked Green to bring him to Providence. Green drove Bolden, who brought along a backpack, to Amita's Providence apartment. Shortly after Amita placed a telephone call, Victor arrived and met privately with Bolden in Amita's kitchen. Bolden and Green then returned to Connecticut, where Green said he saw an indeterminate amount of money in Bolden's backpack.

Sometime after this first meeting, Green alleged, Victor called, saying he needed more drugs. Green again arranged a conference call between himself, Victor, and Bolden. Green maintained that, as he did during the first conference call, he placed the telephone down and did not listen to the conversation. When Green picked up the telephone again, Victor was no longer on the line, and Bolden told Green that he would send "three [kilos] of cocaine" by Federal Express to Green for delivery to Victor. According to Green, a package containing white powder wrapped in plastic later arrived.

Green, accompanied by his sister and nephew, transported the package to Amita's apartment in Providence. Shortly after Green arrived at Amita's apartment, Victor also arrived. Victor instructed Green to follow him to another location. After arriving at the other location, Green and Victor entered a second-floor apartment. Green testified that Victor went into a back room, but soon came running out accompanied by two armed and masked men. Green testified that although the gunmen were masked, he could see their skin color, and that "one was light skin and the other one was dark." According to Green, the masked men pointed their guns at his head, and Victor screamed "This is my town. I own this town." The lighter-skinned gunman said "Let me do him," then the other gunman took the Federal Express package and left. Shortly thereafter, Green traveled back to Connecticut and called Bolden to inform him about what had transpired.

Green testified that he also telephoned Victor St. Hill that night, then made a series of telephone calls to Bolden and

Victor. As a result of these telephone calls, Victor agreed to give Bolden $10,000 and Bolden instructed Green to travel to Providence to pick up the money. Green complied and, upon returning to Connecticut, called Bolden, who instructed Green to hang onto the money. Green then arranged another conference call between himself, Bolden, and Victor. Green again testified that he placed the telephone down and did not listen to their conversation. Upon picking up the telephone, Victor no longer was on the line, and Bolden informed Green that he would obtain some guns and travel to Providence to "rip [Victor] off."

On March 9, 1995, Bolden called Green and instructed Green to pick him up at Bradley International Airport. Green rented a Pontiac Grand Am, picked Bolden up at the airport and, at Bolden's request, the two men went to a nearby Kmart, where Bolden purchased a backpack, a package of baby wipes, and ammunition. Green denied having any idea why Bolden purchased these items, and insisted that he and Bolden had no plan concerning what they were to do that day. Green and Bolden drove to Amita's apartment, and upon arrival, Bolden gave Green a handgun and told him to go upstairs to Amita's apartment and wait for Victor to arrive. Bolden waited in the car. Green testified that after he entered the apartment, Victor arrived within a short period. Victor then left Amita's apartment, and returned a short time later accompanied by another man, whom Green identified at trial as Oliveira. Green testified that both men were armed, and Victor carried a tennis-shoe bag. Green testified that Victor asked him whether he recognized Oliveira, and Green replied that he did not. Victor then started to explain, "You don't remember him? He was the one—[.]"

Victor then directed Oliveira downstairs. Victor gave the tennis-shoe bag to Amita, who took the bag and went downstairs with it. Green testified that Victor then began acting hysterical, so Green sprayed mace in his face and ran out of the apartment. Green said that he saw Amita standing on the curb holding the tennis-shoe bag and Bolden sitting in the rented Grand Am in the middle of the street. Green also saw a blue Lincoln, with Oliveira in the driver's seat, parked on the side of Amita's apartment. Green grabbed the tennis-shoe bag from Amita and attempted to enter the Grand Am on the passenger side, but the car door was locked. Green testified that he saw the Lincoln pull up behind the Grand Am and a person in the back seat, whom Green could not identify, tried to stick a gun out the window. Green started to run, and the gun he was carrying fell out of his pants. Green said he heard a gunshot and saw the Grand Am crash into another vehicle. Green reported hearing many gunshots, and alleged that Oliveira was shooting at him. Green testified that he ran through the backyards of several houses and then hid under a U-haul trailer for several hours. Green eventually crawled out from under the trailer, called his sister in Connecticut on his cell phone, and got her to obtain the number of a local cab company. Green contacted the company and had the driver take him back to Connecticut.

The Providence police contacted Green in Connecticut that evening, and he met with police officers at the Hartford Police Department on March 10, 1995, and again on March 13, 1995. Green provided a statement describing the events surrounding Bolden's murder, identified Oliveira from a photo array as the driver of the Lincoln, and turned over to police the tennis-shoe bag full of cash, which the police eventually determined contained $43,640. On March 13, 1995, after receiving some

assurances from the Providence police that he would not be prosecuted, Green provided a second statement.

Besides Green, the state presented the testimony of several Providence police officers who investigated the crime scene; firearms examiner Robert A. Hathaway, who testified that bullets recovered from the scene and from Bolden's body came from two different guns; Chief Medical Examiner Elizabeth Laposata, who described the gunshot wounds Bolden suffered and labeled the death a homicide; Green's sister, Karen Green, who corroborated certain aspects of Green's testimony concerning his carrying a box to a location where he alleged that he was robbed; and three civilian witnesses, who testified that they either heard the gunshots or saw a man running from the scene. At the close of the state's case, the parties stipulated that a kilogram of cocaine is more than an individual would possess for personal use.

After the close of the state's evidence, Victor St. Hill moved for a judgment of acquittal on count 1, pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. He argued that, viewing the evidence in the light most favorable to the state, no evidence was presented that Victor or Oliveira were involved in an effort to "manufacture, deliver, sell or distribute controlled substances," as alleged in the indictment. Rather, he asserted, the evidence supported an "attempt[ ] to purchase, obtain, acquire, [or] receive" a substantial quantity of a controlled substance with the intent to deliver. Oliveira joined in this motion. Amita then moved for judgment of acquittal on count 3, arguing that "her mere presence and her mere knowledge of a drug conspiracy" was insufficient to support a conviction on count 3. The trial justice denied all three motions, finding sufficient evidence from which the jury could infer that Bolden was killed during the course of a sale, delivery, or distribution of cocaine, and that Amita was part of a conspiracy to violate the Rhode Island Controlled Substances Act, G.L. 1956 chapter 28 of title 21 (hereinafter RICSA). Subsequent to the denial of the motions for judgment of acquittal, all three defendants declined to present any testimony. The defendants then renewed their motions for judgment of acquittal, and the trial justice denied all three motions "on the same basis as I have previously expressed."

During closing arguments, the state asserted that Victor and Oliveira killed Bolden "during the course of an attempted drug distribution." The state asserted that because Victor and Oliveira were attempting to purchase a large quantity of drugs—"far more than [Victor] could use for his personal use"—the killing occurred during the course of the "attempted receipt and redistribution of the drugs." In instructing the jury, the trial justice stated:

"In order for either Gahlil Oliveira and/or Victor St. Hill to be found guilty of murder, the [s]tate must prove beyond a reasonable doubt that a killing occurred during the perpetration or attempted perpetration of the sale, delivery or other distribution of a controlled substance forbidden by law, and cocaine is such a substance. As used in this statute, perpetrate means to bring about, to carry out, to commit. Attempt to perpetrate means to do an act in an effort to bring about or accomplish something. Sale, delivery and distribution mean what the words imply and need no definition from me.

"If you find from all the evidence and the reasonable inferences to be drawn from that evidence that the [s]tate has proven each and every element of the offense of felony murder, that is, that a

killing occurred during the commission of an unlawful drug activity as I've described it, beyond a reasonable doubt, you must bring back verdicts of guilty against [Victor St. Hill and Gahlil Oliveira]."

At the close of the jury instructions, Victor and Oliveira objected to the trial justice's failure to define "sale, distribution and/or delivery," and to the trial justice's statement that those words "mean what the words imply and need no definition from me."

The jury subsequently found Victor St. Hill and Gahlil Oliveira guilty of felony murder in the first degree for the murder of Grady Bolden. The jury also found Oliveira, Victor, and Amita guilty of conspiracy to unlawfully possess, sell, or deliver a controlled substance. The trial justice sentenced Oliveira and Victor to the mandatory life term for their first-degree murder convictions, and a sentence of thirty years (ten to serve, the remainder suspended with probation) for their conspiracy conviction. The trial justice imposed a fifteen-year suspended sentence on Amita for the conspiracy conviction.

## I

### Motion for Judgment of Acquittal

On appeal, Oliveira and Victor St. Hill allege that the trial justice committed reversible error when he denied their motion for judgment of acquittal on the charge of first-degree felony murder. Count 1 of the indictment charged "murder in the first degree, to wit: murder committed during the course of the perpetration, or attempted perpetration of felony manufacture, sale, delivery or other distribution of a controlled substance otherwise prohibited by the provisions of Chapter 28 of title 21 of the General Laws of Rhode Island, in violation of § 11–23–1 of the General Laws of Rhode Island, 1956, as amended (Reen-

actment of 1994)." In their Rule 29 motion and again on appeal, Oliveira and Victor contend that no reasonable reading of this statute encompasses their actions because all the evidence at trial, viewed in the light most favorable to the state, demonstrated that they were unsuccessfully attempting to purchase or possess a controlled substance, not to manufacture, sell, deliver, or distribute it. The state counters that defendants were guilty of an attempt to distribute cocaine, based on the fact that they attempted to purchase over $43,000 worth of cocaine for further distribution. The trial justice rejected defendants' contention, concluding that, if all reasonable inferences were drawn in the state's favor, the evidence sufficiently established that Bolden was murdered during the perpetration of a sale, delivery or distribution of a controlled substance that continued "from November 1994, through March of 1995."

### Standard of Review

 "In reviewing a claim of legal sufficiency of the evidence in the context of a motion for a judgment of acquittal, this Court applies the same standard as that applied by the trial court, namely, '[we] must view the evidence in the light most favorable to the state, * * * giving full credibility to the state's witnesses, and draw therefrom all reasonable inferences consistent with guilt.'" *State v. Higham,* 865 A.2d 1040, 1048 (R.I.2004) (quoting *State v. Otero,* 788 A.2d 469, 475 (R.I. 2002)). "In addition, the trial justice is required to view only that evidence that the prosecution claims is capable of supporting proof of guilt beyond a reasonable doubt." *State v. Andrades,* 725 A.2d 262, 263 (R.I.1999) (quoting *State v. LaRoche,* 683 A.2d 989, 995 (R.I.1996)). "If that examination reveals sufficient evidence to warrant a jury verdict of guilt beyond a

reasonable doubt, the trial justice should be held to be correct in his or her denial of the motion." *State v. Bulgin*, 845 A.2d 308, 311 (R.I.2004) (quoting *State v. Pena Lora*, 746 A.2d 113, 119 (R.I.2000)).

## Felony–Murder Statute

Before viewing the state's evidence, however, we must determine whether the "perpetration, or attempted perpetration, of felony manufacture, sale, delivery, or other distribution of a controlled substance" encompasses the purchase, or attempt to purchase, with intent to sell or distribute a controlled substance. Section 11–23–1 provides in part that "[e]very murder * * * committed during the course of the perpetration, or attempted perpetration, of felony manufacture, sale, delivery, or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 28 of title 21, * * * is murder in the first degree. Any other murder is murder in the second degree." To sustain a first-degree felony-murder conviction, the state must establish all the elements of the relevant predicate offense as well as the fact of the murder. *State v. Innis*, 120 R.I. 641, 656, 391 A.2d 1158, 1166 (1978), *rev'd on other grounds*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *see also State v. Villani*, 491 A.2d 976, 980 (R.I.1985).

Oliveira and Victor St. Hill argue that the felony-murder statute does not include the purchasing or possession of drugs with intent to deliver among the predicate offenses warranting a charge of murder in the first degree. They contend that under the statutory scheme in Rhode Island, "possession with intent to deliver" is an independent unit of prosecution, distinct from "sale, delivery, or distribution." Because the Legislature did not include the statutory felony "possession with intent to deliver" within the enumerated felonies supporting a first-degree felony-murder charge, although it did include other identifiable drug felonies, they reason, the Legislature made clear that it did not intend that "possession with intent to deliver" serve as a predicate for first-degree murder. Oliveira and Victor contend, therefore, that, at most, they should have been charged with second-degree murder.

The state asserts that Oliveira and Victor murdered Bolden while attempting to consummate a drug transaction that would result in their acquisition of more than $43,000 worth of cocaine, which they intended to redistribute. The state argues, however, that the language of the felony-murder statute is drafted "broadly enough to include all felony drug transfers and attempted transfers otherwise prohibited by the RICSA, regardless of whether the particular felony is explicitly named in the felony-murder statute." The state posits that the "manufacture, sale, delivery, or other distribution of a controlled substance" language of § 11–23–1 encompasses the broader concept of "transfer" and thus reflects the legislative goal of criminalizing participation in every aspect of a drug transaction, regardless of the individual's role in the transaction. The state also argues that the sweeping language of § 11–23–1, "during the course of the perpetration, or attempted perpetration" of one of the listed drug-related transactions, also reflects the statute's broad scope. Moreover, the state asserts that the phrase "or other distribution of a controlled substance otherwise prohibited by the provisions of [RICSA]" draws within its ambit all drug transfers or attempted transfers prohibited by RICSA, including "possession with intent to deliver."

The state also asserts that "possession with intent to deliver" is one of a number of drug felonies, the establishment of which could serve as a predicate offense

for first-degree felony murder because, depending on the facts, it can also be charged as an *attempted* "sale, delivery or other distribution." Thus, "possession with intent to deliver" is simply one substantial step that a perpetrator can take toward accomplishing the sale, delivery, or other distribution of a controlled substance. Finally, the state asserts that interpreting § 11–23–1 in any other manner would lead to an absurd result: an individual convicted of a murder occurring during the individual's acquisition of a large quantity of drugs would be guilty of *second-degree* felony murder, whereas the individual who sold the drugs to him would be guilty of *first-degree* felony murder.

▋ The resolution of this issue requires this Court to determine which predicate drug offenses can satisfy a first-degree felony murder charge under § 11–23–1. This Court reviews questions of statutory interpretation *de novo, Johnston v. Poulin*, 844 A.2d 707, 711 (R.I.2004), and in undertaking this analysis, we apply our well-established maxims of statutory construction. "It is well settled that when the language of a statute is clear and unambiguous, [we] must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Id.* (quoting *State v. DiCicco*, 707 A.2d 251, 253 (R.I.1998)). "Moreover, when we examine an unambiguous statute, 'there is no room for statutory construction and we must apply the statute as written.'" *Id.* (quoting *DiCicco*, 707 A.2d at 253). "If we discern a statutory ambiguity, this Court establishes and effectuates the legislative intent behind the enactment." *State v. Fritz*, 801 A.2d 679, 682 (R.I.2002). "Of course, it is equally well established that, when confronted with statutory provisions that are unclear or ambiguous, this Court, as *final arbiter* of questions of statutory construction, will examine statutes in their

entirety, and will 'glean the intent and purpose of the Legislature "from a consideration of the entire statute, keeping in mind [the] nature, object, language and arrangement" of the provisions to be construed.'" *DiCicco*, 707 A.2d at 253 n. 1 (quoting *In re Advisory to the Governor*, 668 A.2d 1246, 1248 (R.I.1996) and *Algiere v. Fox*, 122 R.I. 55, 58, 404 A.2d 72, 74 (1979)).

▋ "When the meaning of a criminal statute is ambiguous, the policy of lenity in the construction of criminal statutes requires that the less harsh of two possible meanings be adopted." *State v. Smith*, 766 A.2d 913, 924 (R.I.2001) (quoting *State v. Anthony*, 422 A.2d 921, 925 (R.I.1980)). "[P]enal statutes must be strictly construed in favor of the party upon whom a penalty is to be imposed[,]" *id.* (quoting *State v. Bryant*, 670 A.2d 776, 779 (R.I. 1996)), and the defendant must "be given the benefit of any reasonable doubt as to whether the act charged is within the meaning of [a penal] statute." *State v. DelBonis*, 862 A.2d 760, 766 (R.I.2004) (quoting *State v. Amaro*, 448 A.2d 1257, 1259 (R.I.1982)). "Moreover, in deciding 'whether [a] defendant's conduct is within the ambit of the statute,' while according the defendant 'the benefit of any reasonable doubt,' * * * we are also constrained by the 'constitutional requirement for certainty in penal statutes.'" *State v. Carter*, 827 A.2d 636, 644 (R.I.2003) (quoting *State v. Dussault*, 121 R.I. 751, 753, 403 A.2d 244, 246 (1979) and *State v. Brown*, 97 R.I. 115, 119, 196 A.2d 133, 136 (1963)). A penal statute "must contain a description or definition of the act or conduct which comprises the offense contemplated therein stated with legal certainty." *Id.* (quoting *Brown*, 97 R.I. at 119, 196 A.2d at 136). It is well established that the state may not hold a person " 'criminally responsible for conduct which he could not reasonably

understand to be proscribed.'" *State v. Authelet,* 120 R.I. 42, 45, 385 A.2d 642, 643 (1978).

### Felony, Manufacture, Sale, Delivery, or Other Distribution of a Controlled Substance Under § 11–23–1

Section 11–23–1 provides that "[e]very murder * * * committed during the course of the perpetration, or attempted perpetration, of felony manufacture, sale, delivery, or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 28 of title 21, * * * is murder in the first degree." To obtain a conviction under a felony murder theory, the state must prove all the elements of the underlying felony, or an attempt to commit the underlying felony, and that the death occurred during the perpetration of the felony, beyond a reasonable doubt. *See Villani,* 491 A.2d at 980 ("In this jurisdiction the felony-murder theory, simply stated, is that any homicide committed while perpetrating or attempting to perpetrate any of the enumerated felonies is first-degree murder."); *Innis,* 120 R.I. at 656, 391 A.2d at 1166 ("In order to obtain a conviction, the state must prove all of the elements of the underlying felony, in addition to the other elements of murder, beyond a reasonable doubt."). It is unnecessary for the state to prove malice or premeditation because this Court has been "quite clear that any homicide committed during the course of a felony enumerated in § 11–23–1 is first-degree murder * * * 'simply because the Legislature has said so.'" *State v. Washington,* 581 A.2d 1031, 1034 (R.I.1990) (quoting *Villani,* 491 A.2d at 980). "The theory of felony murder is that a defendant does not have to have intended to kill one who dies during the course of certain statutorily enumerated felonies, or other inherently dangerous felonies, in order to be charged with murder. The intent to commit the underlying felony will be imputed to the homicide, and a defendant may thus be charged with murder on the basis of the intent to commit the underlying felony." *State v. Stewart,* 663 A.2d 912, 920 (R.I. 1995).

Rhode Island's felony-murder statute, § 11–23–1, does not explicitly define the underlying felony "manufacture, sale, delivery, or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 28 of title 21." Section 21–28–4.01(a)(1) states "[e]xcept as authorized by this chapter, it shall be unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver a controlled substance." When faced with statutory provisions that are *in pari materia,* we construe them in a manner that attempts to harmonize them and that is consistent with their general objective scope. *In re Doe Grand Jury Proceedings,* 717 A.2d 1129, 1132 (R.I. 1998). It is obvious that the two statutes mirror each other in some respects, *i.e.,* each contain "manufacture" and "deliver/delivery." Section 21–28–4.01(a)(1), however, criminalizes "possess[ion] with intent to manufacture or deliver[,]" whereas § 11–23–1 omits any reference to "possess[ion] with intent to deliver," and instead incorporates the language "sale * * * or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 28 of title 21." We conclude this distinction is significant.[2]

---

2. In interpreting RICSA, "we are well aware that the General Assembly did not pass that legislation in a vacuum." *State v. Reis,* 815 A.2d 57, 63 (R.I.2003). "Rather, federal law provided the regulatory milieu in which our act was enacted, and our act represents an attempt 'to establish a system of substances control which is, to the extent possible, uniform with the laws of the United States.'" *Id.* (quoting *State v. Udin,* 419 A.2d 251, 257

The RICSA contains the following definitions:

" 'Deliver' or 'delivery' means the actual, constructive, or attempted transfer of a controlled substance or imitation controlled substance, whether or not there exists an agency relationship." Section 21–28–1.02(10).

" 'Distribute' means to deliver (other than by administering or dispensing) a controlled substance or an imitation controlled substance and includes actual constructive, or attempted transfer. 'Distributor' means a person who so delivers a controlled substance or an imitation controlled substance." Section 21–28–1.02(16).

" 'Sell' includes sale, barter, gift, transfer, or delivery in any manner to another, or to offer or agree to do the same." Section 21–28–1.02(40).

The RICSA defines each of these terms to mean a "transfer" of a controlled substance to another, not its receipt. The term "deliver" is defined as an "actual, constructive, or attempted transfer." Section 21–28–1.02(10). The term "distribute" is defined as "to deliver" or "transfer," and a "distributor" is one "who so delivers" a controlled substance. Section 21–28–1.02(16). Likewise, the term "sell" is also defined in terms of the "transfer[ ] or delivery in any manner to another." Section 21–28–1.02(40).[3] The term "sell" does extend beyond the transfer or delivery to another, but only insofar as it reaches an agreement to transfer or deliver to another. Thus, the terms "sell," "deliver," and "distribute" all refer to the actions of one who transfers *to another*, and are the opposite of one who purchases or receives *from another*.

■■■■■■■ Moreover, under § 21–28–4.01(a)(1), the crime of "possess[ion] with intent to manufacture or deliver" is a separate and distinct offense from the manufacture or delivery of a controlled substance. To prove possession with intent to deliver, "the state must show that a defendant was in possession of drugs, had the requisite control over them, and intended to deliver the drugs to others." *State v. Williams*, 656 A.2d 975, 978 (R.I.1995). "In Rhode Island possession within the context of a criminal statute means an intentional control of an object with knowledge of its nature." *State v. Colbert*, 549 A.2d 1021, 1023 (R.I.1988); *see also United States v. Randall*, 171 F.3d 195, 209 (4th Cir.1999) ("The elements of possession with intent to distribute of a narcotic controlled substance are as follows: (1) possession of the narcotic controlled substance, (2) knowledge of the possession, and (3) intent to distribute the narcotic controlled substance."); *United States v. Gore*, 154 F.3d 34, 45 (2d Cir.1998) (defining the essential elements of the crime of possession with intent to distribute as "that the defendant: (1) knowingly (2) possessed a controlled substance (3) with a specific intent to distribute it"). "To find a defendant guilty of delivering a controlled substance the state must prove beyond a reasonable doubt: (1) that there was an unlawful delivery of a controlled substance and (2) that defendant was the one who made the unlawful delivery." *State v.*

---

(R.I.1980) and G.L.1956 § 21–28–1.01(b)(5)). The federal analogue to RICSA is the Comprehensive Drug Abuse Prevention and Control Act. *Id.* The federal Comprehensive Drug Abuse Prevention and Control Act is structured to "cast its net as broadly as possible," and "is structured in such a way as to criminalize successive stages of a single undertaking." *United States v. Mendoza*, 902 F.2d 693, 696 (8th Cir.1990).

**3.** *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 13.3(e) at 371 (2nd ed. 2003) ("a purchaser is not a party to the crime of illegal sale").

*Rodriguez,* 742 A.2d 728, 732 (R.I.1999). Thus, the crime of "delivery" of a controlled substance "require[s] an additional fact—delivery—which proof of the possession charge did not." *State v. Anil,* 417 A.2d 1367, 1374 (R.I.1980).[4] Likewise, the elements of the crime of "distribution of a narcotic controlled substance are as follows: (1) distribution of the narcotic controlled substance, (2) knowledge of the distribution, and (3) intent to distribute the narcotic controlled substance." *Randall,* 171 F.3d at 209; *see also Gore,* 154 F.3d at 45 ("To be liable for distribution, the government must prove beyond a reasonable doubt that the defendant 'knowingly and intentionally * * * distributed * * * a controlled substance.' "). Thus, under § 21–28–4.01(a) "possession with intent to deliver" and "delivery" are two different offenses.[5] *See Randall,* 171 F.3d at 209 ("[W]e conclude that possession with intent to distribute and distribution are necessarily two different offenses."); *United States v. Willoughby,* 27 F.3d 263, 266–67 (7th Cir.1994) ("Distribution and possession with intent to distribute are two separate trafficking offenses, two separate crimes * * *. Because 'distribution' relates to different conduct than does 'possession with intent to distribute', not just in theory, but in this case, a charge referencing one of these trafficking offenses cannot be deemed the equivalent of a charge referencing the other."); *United States v. Hernandez,* 591 F.2d 1019, 1026 (5th Cir.1979) (stating that the literal disjunctive provisions of 21 U.S.C. § 841(a)(1), which makes it illegal to " 'manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance,' " "on their face show the creation of distinct and separate offenses for possession with intent to distribute and distribution"); *State v. Celestine,* 671 So.2d 896, 896–97 (La.1996) ("In accord with the overwhelming weight of authority at the federal and state level, * * * we hold * * * that when a purchaser takes delivery of the narcotics transferred into his possession by the distributor he has committed a possessory offense only.").

Moreover, we reject the state's assertion that the phrase "or other distribution of a controlled substance otherwise prohibited by the provisions of [RICSA]" draws within its ambit all drug transfers or attempted transfers prohibited by RICSA, including "possession with intent to deliver." The doctrine of *ejusdem generis* provides that when "a series of specific terms in a statute is followed by a general term * * * the general term, will be con-

---

4. In *State v. Anil,* 417 A.2d 1367, 1374 (R.I. 1980), we stated that "proof of possession with intent to deliver required proof of no additional fact that was not an essential fact of proof of delivery. In other words, only one of these offenses required proof of an additional fact; all of the elements of one offense (possession with intent to deliver) were present in the other (delivery)." We note that recent decisions of the federal courts indicate that this statement may be overly restrictive. *See United States v. Sepulveda,* 102 F.3d 1313, 1316–17 (1st Cir.1996) ("The offense of distribution obviously does require an element not required for the crime of possession with intent, namely, the act of distribution. It is possible—albeit unusual—to be guilty of distribution of a drug without also possessing it with intent to distribute. Someone who participates in a drug transfer—*e.g.,* as a broker or armed guard—can be liable for distribution without ever possessing the drugs. * * * While 'possession' is certainly helpful in proving distribution, it is technically not a necessary element.").

5. As we explained in *State v. Ahmadjian,* 438 A.2d 1070, 1087 (R.I.1981), "[w]hen there is clear evidence that a defendant has possession and control of a substantial cache of drugs from which he delivers quantities in a series of sales or transfers, he clearly could be tried and sentenced for both possession and delivery."

strued to embrace only additional examples of a similar nature as those enumerated." *State v. Dearmas*, 841 A.2d 659, 667 (R.I.2004) (quoting *First Republic Corp. of America v. Norberg*, 116 R.I. 414, 419, 358 A.2d 38, 41 (1976)). As employed within § 11–23–1, the phrase "or other distribution of a controlled substance otherwise prohibited by the provisions of [RICSA]" does not apply to the crime of "possession with intent to distribute," a crime that involves no actual or attempted transfer of controlled substances. When we read it narrowly, as we are constrained to do, the language of § 11–23–1 is a clear recognition by the Legislature that not all the controlled substance offenses enumerated in § 21–28–4.01(a) are predicate offenses for first-degree felony murder.

We now turn to the state's argument that "possession with intent to deliver" is one of a number of drug felonies, the establishment of which could serve as a predicate offense for first-degree felony murder because, depending on the facts, it also can be charged as an *attempted* "sale, delivery or other distribution."[6] The state argues that, viewing the evidence in the state's favor, the jury could infer that, by attempting to acquire $43,000 worth of cocaine, Victor and Oliveira intended to distribute that cocaine. The state further contends that this attempted acquisition also constitutes the "substantial step" necessary to establish the attempted commission of the delivery or distribution of a controlled substance. We disagree.

In *State v. Latraverse*, 443 A.2d 890, 893 (R.I.1982),[7] we adopted the definition of attempt embodied in § 5.01 of the American Law Institute's Model Penal Code (Proposed Official Draft 1962), which provides in part:

"Criminal Attempt.

"(1) *Definition of Attempt.* A person is guilty of an attempt to commit a crime if, acting with the kind of culpability otherwise required for commission of the crime, he:

(a) purposely engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

(b) when causing a particular result is an element of the crime, does or omits to do anything with the purpose of causing or with the belief that it will cause such result without further conduct on his part; or

(c) purposely does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

"(2) *Conduct Which May Be Held Substantial Step Under Subsection (1)(c).* Conduct shall not be held to constitute a substantial step under Subsection (1)(c) of this Section unless it is strongly corroborative of the actor's criminal purpose. Without negativing the sufficiency of other conduct, the following, if strongly corroborative of the

---

6. Under G.L.1956 § 11–23–1 "[e]very murder * * * committed during the course of the perpetration, or *attempted perpetration,* of felony manufacture, sale, delivery, or other distribution of a controlled substance otherwise prohibited by the provisions of chapter 28 of title 21, * * * is murder in the first degree." (Emphasis added.) *See also Jefferson v. State,* 472 A.2d 1200, 1202–03 (R.I.1984) (attempted

robbery can support felony-murder conviction).

7. *State v. Latraverse,* 443 A.2d 890, 892 (R.I. 1982), is particularly notable for Justice Kelleher's evocation of Lord Mansfield, Mr. Justice Oliver Wendell Holmes, Mr. Justice Benjamin Cardozo, and Judge Learned Hand in a single opinion, indeed on a single page.

actor's criminal purpose, shall not be held insufficient as a matter of law:

(a) lying in wait, searching for or following the contemplated victim of the crime;

(b) enticing or seeking to entice the contemplated victim of the crime to go to the place contemplated for its commission;

(c) reconnoitering the place contemplated for the commission of the crime;

(d) unlawful entry of a structure, vehicle or enclosure in which it is contemplated that the crime will be committed;

(e) possession of materials to be employed in the commission of the crime, which are specially designed for such unlawful use or which can serve no lawful purpose of the actor under the circumstances;

(f) possession, collection or fabrication of materials to be employed in the commission of the crime, at or near the place contemplated for its commission, where such possession, collection or fabrication serves no lawful purpose of the actor under the circumstances;

(g) soliciting an innocent agent to engage in conduct constituting an element of the crime."

Applying it to this case, the state, in order to prove an attempted delivery or distribution of cocaine, is required to prove that Victor and Oliveira acted with "the kind of culpability otherwise required for commission of the crime" of delivery or distribution, and that Victor and Oliveira purposely did an act "which, under the circumstances as [they] believe[d] them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in [their] commission of the crime" of delivery or distribution. "It is generally agreed that neither the intent to commit a crime nor mere preparation in and of itself constitutes an at-

tempt." *Latraverse,* 443 A.2d at 892; *see also People v. Jones,* 443 Mich. 88, 504 N.W.2d 158, 164 (1993) ("Mere preparation is distinguished from an attempt in that the former consists of making arrangements or taking steps necessary for the commission of a crime, while the attempt itself consists of some direct movement toward commission of the crime that would lead immediately to the completion of the crime."); LaFave & Scott, *Criminal Law,* § 6.2 at 495 (2d ed. 1986) (attempt requires "an act in furtherance of that intent which, as it is most commonly put, goes beyond mere preparation").

This Court has held that a fact-finder can infer an intent to deliver controlled substances solely on the basis of the amount of the drugs found. *State v. Colbert,* 549 A.2d 1021, 1024–25 (R.I.1988); *see also United States v. Samad,* 754 F.2d 1091, 1096 (4th Cir.1985) ("A defendant's intent to distribute the drug may be inferred from the quantity of drugs he possesses."); *People v. Robinson,* 167 Ill.2d 397, 212 Ill.Dec. 675, 657 N.E.2d 1020, 1026 (1995) ("Because direct evidence of intent to deliver is rare, such intent must usually be proven by circumstantial evidence."). In this case, we consider it patently clear that the jury could have inferred an intent on the part of Victor and Oliveira that, based on their efforts to acquire $43,000 worth of cocaine, they possessed "the kind of culpability otherwise required for commission of the crime" of delivery or distribution.

The more difficult task, however, is determining whether such efforts constituted "a substantial step in a course of conduct planned to culminate in [their] commission of the crime" of delivery or distribution. In adopting the definition of attempt embodied in § 5.01 of the American Law Institute's Model Penal Code, we recognized that we were "drawing the line be-

tween attempt and noncriminal preparation further away from the final act so as to make the crime essentially one of criminal purpose implemented by an overt act strongly corroborative of such purpose." *Latraverse*, 443 A.2d at 894. In addressing the substantial-step clause, we noted that "[t]o constitute a substantial step, the conduct must be 'strongly corroborative of the actor's criminal purpose.' The application of this standard will, of course, depend upon the nature of the intended crime and the facts of the particular case. A substantial step in the commission of robbery may be quite different from that in arson, rape, or some other crime, but this standard properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime." *Id.* at 894–95. This analysis "shifts the emphasis from what remains to be done to what already has been done. Thus, liability for a relatively remote preparatory act is precluded, but at the same time dangerous individuals may be lawfully apprehended at an earlier stage of their nefarious enterprises * * *." *Id.* at 895.

In this case, the state asks us to declare that attempting to acquire a large amount of a controlled substance constitutes a substantial step toward the distribution or delivery of that controlled substance. As stated above, under § 21–28–4.01(a) "possess[ion] with intent to deliver" and "delivery" or "distribution" are two different offenses. The crime of "distribution" or "delivery" of a controlled substance requires that the state prove the actual or attempted distribution or delivery of a controlled substance, knowledge of the distribution or delivery, and intent to distribute or deliver a controlled substance. *See Randall*, 171 F.3d at 209; *Gore*, 154 F.3d at 45. Victor and Oliveira's actions in attempting to acquire the cocaine, if successful, would have resulted in their possessing $43,000 worth of cocaine, and

would have satisfied the elements of the crime of possession with intent to deliver. Possessing this substantial quantity of cocaine, however, would not have exposed them to the crime of delivery. In attempting to acquire the cocaine, they took no act toward the "actual, constructive, or attempted transfer" of a controlled substance. Some further "overt act strongly corroborative of" delivering or distributing the cocaine is required to constitute an attempted delivery. Attempting to acquire a substantial quantity of a controlled substance allows the finder of fact to infer that a defendant possesses the intent to further deliver the controlled substance; the intent to deliver or distribute a controlled substance, however, cannot in and of itself constitute an attempt to do that crime. *See Latraverse*, 443 A.2d at 895; *see also* LaFave, *Criminal Law*, § 11.4 at 588 (4th ed. 2003) ("One of the basic premises of the criminal law is that bad thoughts alone cannot constitute a crime. This is no less true as an attempt, and thus it is not enough that the defendant have intended to commit a crime. There must also be an act, and not any act will suffice."). Here, the actions of defendants were at least one step removed from the commission of the predicate offense for felony murder.

 This holding comports with our general requirement that "in order to achieve proof beyond a reasonable doubt in respect to a key element of a criminal offense, an inference must be solidly based upon evidence that points with certainty toward the required conclusion." *State v. Eiseman*, 461 A.2d 369, 383 (R.I.1983). Consequently, we are constrained to conclude that attempting to acquire a substantial quantity of a controlled substance, without some further act directed at the delivery or distribution of the contraband, does not satisfy the substantial step re-

quired to constitute attempted distribution or delivery.[8]

 Finally, we pause briefly to address the state's contention that interpreting the felony-murder statute as applying to sellers or distributors of controlled substances, but not applying to purchasers of these controlled substances, results in an irrational reading of the statute. The state asserts that interpreting § 11–23–1 in this manner would lead to an absurd result; an individual convicted of a murder occurring during the individual's acquisition of a large quantity of drugs would be guilty of *second-degree* felony murder, whereas the individual who sold the drugs to him would be guilty of *first-degree* felony murder. "How to effectuate policy— the adaptation of means to legitimately sought ends—is one of the most intractable of legislative problems. Whether proscribed conduct is to be deterred by *qui tam* action or triple damages or injunction, or by criminal prosecution, or merely by defense to actions in contract, or by some, or all, of these remedies in combination, is a matter within the legislature's range of

choice. Judgment on the deterrent effect of the various weapons in the armory of the law can lay little claim to scientific basis." *Tigner v. Texas*, 310 U.S. 141, 148, 60 S.Ct. 879, 84 L.Ed. 1124 (1940) (Justice Frankfurter). This Court is bound by the Legislature's choice not to include "possession with intent to deliver" as one of the enumerated predicate offenses for first-degree felony murder. "Unfortunately, neither the trial justice nor this court has any authority to supplement or to amend a statute enacted by the General Assembly." *State v. Bryant*, 670 A.2d 776, 779 (R.I. 1996). Moreover, we cannot say that it is absurd for the Legislature to distinguish "delivery" or "attempted delivery" from "possession with intent to deliver" for purposes of exposing a defendant to the mandatory sentence of life imprisonment.

 In interpreting § 11–23–1, and harmonizing it with RICSA, we are constrained to conclude that the terms "sale, delivery, or other distribution" contained within § 11–23–1 do not encompass one who attempts to purchase or receive a controlled substance from a seller, distrib-

8. The state's reliance on decisions from the State of Oregon for the proposition that the attempted possession of controlled substances, combined with the intent to sell the contraband, establishes that defendants engaged in an attempted delivery or distribution is misplaced. In *State v. Boyd*, 92 Or.App. 51, 756 P.2d 1276, 1277–78 (1988), the Oregon Court of Appeals held that possession of a drug with the intent to deliver it amounts to attempted delivery of that drug under Oregon law. Before reaching this conclusion, however, the court noted a significant distinction between the Uniform Controlled Substances Act and Oregon's Controlled Substances Act.

"The uniform act separately penalizes delivery, possession with intent to deliver and possession. * * * The Oregon act separately penalizes delivery and possession, but not possession with intent to deliver. ORS 475.992(1),(4).

"The fact that the Oregon legislature did not choose to make possession with intent

to deliver a separate crime does not mean that it intended to punish possession of controlled substances intended for distribution as simple possession only. Under the uniform act, as well as under the federal statutory scheme, delivery and possession with intent to deliver are crimes punishable by the same penalties. The offense of simple possession is subject to substantially lesser penalties. See 21 U.S.C. §§ 841(a), 844; 9 *Uniform Laws Annot.*, § 401(a),(c). There is no indication that the Oregon legislature intended to punish an attempt to transfer a controlled substance other than as the completed transfer. It did so without enacting the distinct crime of possession with intent to deliver * * *." *Boyd*, 756 P.2d at 1277–78.

Given the apparent uniqueness of Oregon's Controlled Substances Act, these decisions are of little persuasive effect.

utor, or deliverer, absent proof that the purchaser or receiver has taken a substantial step toward reselling, redelivering, or redistributing the controlled substances.

In our review of the facts, viewing the evidence in the light most favorable to the state, giving full credibility to the state's witnesses, and drawing every reasonable inference consistent with guilt, the evidence clearly demonstrates that on or about March 9, 1995, Victor St. Hill and Gahlil Oliveira were attempting to acquire a substantial amount of cocaine with the intent to distribute it. No evidence was presented about any acts by either individual to further deliver or distribute the drugs. Count 1 of the indictment charged Victor and Oliveira with first-degree felony murder based on the theory that the murder was committed "during the course of the perpetration, or attempted perpetration, of felony manufacture, sale, delivery or other distribution of a controlled substance." We conclude that the state has failed to prove that either defendant committed the underlying predicate offense sufficient to support first-degree felony murder.[9] Whereas the evidence tying Victor and Oliveira to the attempt to possess a substantial quantity of cocaine was overwhelming and the intent to deliver element

can be inferentially established from the quantity of cocaine they sought to acquire, the record is devoid of any evidence that establishes, either directly or inferentially, that Victor or Oliveira took any action in an effort to further distribute or deliver the cocaine. Consequently, we are constrained to conclude that their motions for judgment of acquittal on the first-degree felony-murder count, should have been granted.

The defendants have raised a number of other issues concerning their first-degree felony-murder convictions; analysis of these issues, however, is unnecessary in light of our determination on the motion for judgment of acquittal. Issues relevant to count 3, conspiracy to unlawfully possess, manufacture, sell, or deliver a controlled substance in violation of § 21–28–4.08 and § 11–1–6, will be addressed below. The judgments of conviction on count 1 are reversed, and the papers in the case may be remanded to the Superior Court with directions to enter a judgment of acquittal in respect to count 1.

## II

### Conspiracy

We now consider the remaining assignments of error raised by all three defen-

---

9. We note that although we hold that "possession with intent to deliver" is not a predicate felony for first-degree felony murder, it may support a conviction for second-degree felony murder. *See State v. Stewart*, 663 A.2d 912, 917 (R.I.1995) ("A felony that is not enumerated in § 11–23–1 can, however, serve as a predicate felony to a charge of second-degree murder."). Second-degree felony murder is not a lesser-included offense to first-degree felony murder because it requires proof of an additional fact—a determination that the crime was committed in an inherently dangerous manner. *See State v. Briggs*, 787 A.2d 479, 487 (R.I.2001) ("A lesser included offense is 'one that does not require proof of any additional element beyond those required by the greater offense.'") (quoting *State v.*

*Rodriquez*, 731 A.2d 726, 729 (R.I.1999)); *Stewart*, 663 A.2d at 919 ("We believe that the better approach is for the trier of fact to consider the facts and circumstances of the particular case to determine if such felony was inherently dangerous in the manner and the circumstances in which it was committed, rather than have a court make the determination by viewing the elements of a felony in the abstract."). Conversely, first-degree felony murder requires no such determination. A homicide committed during the course of an enumerated predicate offense is first-degree felony murder "simply because the Legislature has said so." *State v. Washington*, 581 A.2d 1031, 1034 (R.I.1990) (quoting *State v. Villani*, 491 A.2d 976, 980 (R.I.1985)).

dants [10] as they relate to their convictions on count 3, conspiring to unlawfully possess, manufacture, sell, or deliver a controlled substance in violation of § 21–28–4.08 and § 11–1–6. Collectively, or individually, they assert six errors by the trial court that warrant the reversal of the conspiracy convictions and a remand for a new trial. Specifically, they contend that the trial court committed reversible error by: (1) giving a jury instruction "tantamount to an *Allen* charge"; (2) by refusing to instruct the jury that in assessing Green's testimony it was entitled to consider any promises, rewards, or inducements that he may have received; (3) precluding defendants from cross-examining Green on his bias or motives; (4) by admitting three hearsay statements under the coconspirators exception to the hearsay rule; (5) denying Oliveira's motion to suppress the out-of-court and in-court eyewitness identification testimony; and (6) permitting Det. John J. Corley of the Providence Police Department to affirm that he relied upon information other than Green's description in selecting Oliveira's photograph for the photo array.

### Supplemental Jury Instructions

The three defendants argue that the trial court committed reversible error when, in response to the tainting and subsequent removal of one juror, it gave an instruction tantamount to an *Allen* charge that described the possibility of retrial as "just terrible," thereby coercing the jury to reach a final verdict whether or not any juror harbored conscientious doubt. Before deliberations commenced, one juror reported that she had received a document in the mail, purporting to be Amita St. Hill's witness statement, which had been

excluded from evidence. The trial justice removed that juror from the panel. The remaining jurors began deliberations later that morning. That afternoon, the trial justice received a request from the jurors that they wished to have some trial testimony read back. Around 4 p.m. the trial justice determined that the court was unable to comply with the request because of the late hour, and reconvened the jurors to release them for the day. The trial justice gave the following cautionary instruction:

"THE COURT: We are at a very critical stage in the proceeding. All the evidence is in. You've been argued to and lectured by me on the law, and there are only twelve of you left to decide the guilt or innocence of these three defendants. We've spent almost five weeks. It would be just terrible if we weren't able to complete this.

"Please don't be offended. I am going to repeat again how important it is that you not talk among yourselves when you leave here or speak to anybody else concerning this case. I am going to ask you not to speak to any of your fellow jurors who were on the case with you. The three that I think of specifically, if they call you, tell them you can't speak to them. Don't speak to them. Don't initiate the call yourself. If I can't assure myself that you can follow my instructions, we're going to have to sequester you, which means put you up overnight in a hotel, and I really didn't want to do that. I don't think it's necessary. You're all adults, and I believe you can follow my instructions. You are not to read anything about this case. If for some reason any materials, whatever kind, written materials, come into your hands, you are not to read it. If you do

---

**10.** Amita St. Hill did not file a brief in this appeal. On January 10, 2005, this Court granted her motion to "join in the appellate brief filed by the co-defendants." We will examine the errors raised by her codefendants to the extent that the arguments addressed by her codefendants apply to her and were properly preserved by her trial counsel.

get some materials, if it's written, I want you to seal them in an envelope and bring it to me immediately. If that happens, don't talk to your fellow jurors about it. Just speak to me. Now, I don't anticipate this thing happening, but Murphy's Law being such as it may, it may. Stay away from TV reports. Stay away from news reports. Do you think you can do all of that? Now, you can recognize something that's untoward. I can't conjure everything up that might happen. I think you can recognize something that might taint you; and if you're tainted, the case will have to be tried again. Can you imagine doing this again? All right. Can you follow all of these instructions then?

"THE FOREPERSON: Yes.

"THE COURT: When you come back tomorrow morning, do not resume deliberations, because I'm going to ask you whether you did everything I just told you to do or not to do. Can you do that? Okay? That's not a big burden, is it? You've been doing it up to now. It's just more of a burden because you are the twelve. We know who the twelve are, and it's most important, we don't want you contacted by anybody. We don't want you tainted by anything. You can understand that, can you not?"

The defendants immediately objected to these instructions, arguing that the portion of the instruction that intimated that the case might have to be retried was tantamount to an *Allen*[11] charge given to a deadlocked jury.

■ We find no support for defendants' assertion that this statement is "tantamount to an *Allen* charge" because of its "coercive" effect on the jury. On review, we "consider the propriety of the trial justice's supplemental instruction 'in

its context and under all the circumstances.'" *State v. Rodriguez,* 822 A.2d 894, 899–900 (R.I.2003) (quoting *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965) (per curiam)). The trial justice was attempting to balance the "conflicting policies of encouraging verdict finality and safeguarding a defendant's right to be judged solely on evidence presented at trial." *State v. Hartley,* 656 A.2d 954, 962 (R.I.1995); *see State v. Souza,* 425 A.2d 893, 900 (R.I.1981) ("Obviously, supplemental charges, like original charges, must be scrupulously fair to the defendant and to the state and must not infringe upon the factfinding province of the jury by coercion or improper suggestion."). An examination of the cautionary instruction given by the trial justice, especially when viewed in the light of the circumstances in which it was given, *viz.,* a juror had just been removed after receiving in the mail the excluded police statement of one of the defendants, clearly shows that it was not coercive and that it did not contain an admonition to any juror to give up his or her convictions in deference to the majority. The cautionary instruction was not issued in an attempt to persuade the jury to reach a unanimous verdict, but was issued as a warning of the serious consequences that would occur if the jury were tainted. The trial justice acted within his discretion to warn the jury, in a way that was fair to the state and defendants, of the danger of accepting or seeking out information that could taint them. Accordingly, we perceive no error in the supplemental instruction.

### Requested Instruction on Promises, Rewards, or Inducements

■ Oliveira argues that the trial justice erred by refusing to instruct the ju-

11. An *Allen* charge is "[a] supplemental jury instruction given by the court to encourage a deadlocked jury, after prolonged delibera- tions, to reach a verdict." Black's Law Dictionary 75 (7th ed. 1999).

rors specifically that in assessing Green's credibility, they were entitled to take into account any promises, rewards, or inducements that Green may have received in exchange for his testimony. After closing arguments, the trial justice delivered a credibility instruction to the jury. In relevant part, the trial justice instructed the jury to:

"Take into account any bias or prejudice the witness may have shown one way or the other and the witness' interest in the outcome of the case, if you believe any witness had any such interest.* * * Occasionally, unfortunately, witnesses do not tell the truth under oath. Witnesses take sides. They tend to exaggerate the evidence which they believe will assist the side they favor and minimize or try to hide the evidence which they believe will harm the side that they favor. It happens that * * * a witness has an interest in the outcome of the case and his or her evidence consciously or subconsciously is influenced or slanted by that interest."

Oliveira objected to the trial justice's failure to include an instruction specifically focused on the promises and rewards Green had received in exchange for his testimony, to which the trial justice responded, "Nobody asked me to. What, am I supposed to think of everything?" Oliveira acknowledged that he had not submitted a written request for such an instruction, but argued that it was "the law of the case" as it had been given at the first trial. Unpersuaded, the trial justice refused to give the instruction, stating that it wasn't necessary. We agree.[12]

■ It is well settled that "a trial justice is not required to give specific instructions requested by a party so long as the charge of the trial justice adequately covers the subject matter relating to the request." *State v. Fenner*, 503 A.2d 518, 525 (R.I.1986). In this instance, the trial justice's credibility instruction adequately covered the issue of bias and prejudice. Although the jurors certainly were entitled to take such promises and motivations into account, their acceptance or rejection of Green's testimony ultimately was their decision to make, free of any peremptory instructions from the trial justice. *See id.*

■ Moreover, in this case, counsel had adequate opportunity to argue matters of credibility, including bias, motivation, anticipated benefits, or rewards during their closing arguments. In this jurisdiction, trial justices "are inhibited from commenting upon the evidence unless they do so in a completely impartial manner." *Fenner*, 503 A.2d at 525. Furthermore, in *Fenner*, we said that "it is probably better practice for a trial justice to avoid giving such instructions in respect either to alibi testimony or to accomplice testimony and to rely instead upon general instructions concerning credibility, motivation, bias, and the like. Counsel rather than the court are the appropriate agents to argue to the jury concerning the specific credibil-

12. We, like the trial justice, are left in the dark concerning Oliveira's comment about law of the case, because no transcript was provided of the jury instructions given in the first trial. A transcript, however, is unnecessary for our disposition of this issue. "The law of the case doctrine * * * is a flexible rule that may be disregarded when a subsequent ruling can be based on an expanded record." *Chavers v. Fleet Bank (RI), N.A.*, 844 A.2d 666, 677 (R.I.2004). In addition, in evaluating an alleged violation of the law of the case doctrine, this Court typically determines the propriety of both rulings and "[g]iven this Court's interest in judicial economy, it is difficult to conceive a situation in which the law of the case doctrine will require reversal of a subsequent correct ruling." *Id.* at 677 n. 10. Because we hold that the trial justice's instruction was proper, reversal on law of the case grounds is not appropriate.

ity or lack thereof of a particular witness." *Id.* In *State v. DeMasi,* 413 A.2d 99 (R.I. 1980), we specifically expressed the opinion that it was not necessary for a trial justice to make, in effect, an impeaching comment upon the testimony of an erstwhile accomplice who had been granted immunity by the Attorney General. *Id.* at 100.

In this case, the trial justice gave a credibility instruction that pointed out that a witness's interest in the outcome of the case might bias or shade his testimony and in turn effect his credibility. The trial justice's instructions on the issue of credibility were adequate and impartial and in no way constituted prejudicial error. Once a defendant's requested instructions have been adequately covered by the instructions given to the jury, the refusal to give the instructions requested by the defendant is not error.

### Cross–Examination of Horace Green and Detective Corley

■■■ All three defendants argue that the trial justice committed reversible error when he precluded them from cross-examining state witnesses concerning Green's bias and motive in violation of the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution. The defendants aver that since Green was "as deeply mired in the events leading to Bolden's death as anyone," was never charged with any crime, and was the primary witness for the state, they had a right to thoroughly cross-examine him concerning his reason for testifying as he did. The defendants contend that the trial justice limited their cross-examination of Green and Det. Corley, the police officer who interviewed Green, concerning "precisely what charges Green avoided with his testimony."

■■■ In applicable part, the Sixth Amendment to the United States Constitu-

tion guarantees that "the accused shall enjoy the right * * * to be confronted with the witnesses against him." Similarly, the Declaration of Rights, article 1, section 10, of the Rhode Island Constitution, provides that "[i]n all criminal prosecutions, accused persons shall enjoy the right * * * to be confronted with the witnesses against them." Accordingly, it is axiomatic that "the trial justice *may not totally prevent* the defendant from exploring the issues of motive, bias, or prejudice in the testimony of the state's chief witness." *State v. Parillo,* 480 A.2d 1349, 1357 (R.I.1984). (Emphasis added.) The "trial justice has no discretion at all under the confrontation clause to *completely prohibit* defense counsel from attempting to elicit testimony from a crucial witness to demonstrate bias upon his part." *Id.* (Emphasis added.) "If the trial justice does so, he or she commits an error of constitutional magnitude under both the Sixth Amendment to the Constitution of the United States and art. 1, sec. 10, of the Rhode Island Constitution." *Parillo,* 480 A.2d at 1357. However, it is also well established that "the scope of cross-examination, even for the purpose of exposing bias [or motive], is not unlimited." *State v. Doctor,* 690 A.2d 321, 327 (R.I.1997). We have reviewed the testimony in this case and find that there was no *per se* violation of defendants' rights of confrontation. The defendants extensively cross-examined both Green and Det. Corley about the nature of, and the circumstances surrounding, the promise not to prosecute Green.

■■■ In situations in which the trial justice does not totally prevent or completely prohibit the defendant from exploring the issues of motive, bias, or prejudice of the witness, we employ an abuse-of-discretion standard on review. "For cross-examination to satisfy constitutional guarantees, the trial justice is required to

afford the accused 'reasonable latitude' to establish or reveal bias, prejudice, or ulterior motives as they may relate to the case being tried." *State v. Hazard,* 745 A.2d 748, 756 (R.I.2000). "[O]nce sufficient cross-examination has been allowed, the constitutional safeguards are satisfied, and any further cross-examination is left within the sound discretion of the trial justice." *Id.* "The trial justice is afforded this discretionary latitude so that he or she may limit cross-examination on the basis of concerns of witness harassment, jury prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *State v. Wiley,* 676 A.2d 321, 324 (R.I.1996). We will not disturb, absent a clear abuse of discretion, the trial justice's discretionary decision to limit the scope of cross-examination. *State v. Walsh,* 731 A.2d 696, 698 (R.I.1999).

We are satisfied the trial justice afforded the defendants "reasonable latitude" to establish or reveal bias, prejudice, or ulterior motives on the part of Green. The record reflects that defense counsel questioned Green at numerous points about his motives for testifying. In response to defendants' cross-examination, Green admitted that he was concerned that he could be charged with a crime, that he did not know what charges could be lodged against him, that he did not ask the police what he could be charged with, and that he made an agreement that if he "told the truth that [he] would not be charged." Detective Corley was also extensively cross-examined. Detective Corley testified that he told Green that if he told the truth he would not be charged with "drug dealing," that he did not tell Green that there could be any other charges, and that Green did not inquire about any other charges. The defendants contend that they were prevented from asking Green about whether he was afraid that the po-

lice would charge him with "robbery." Our review of the transcripts clearly demonstrates that, in the context in which it was asked, the question was not designed to probe Green's motive or bias, but rather to express defense counsel's incredulity with Green's version of events. Consequently, because the question clearly appears argumentative, the trial justice did not abuse his discretion in sustaining the state's objection to the question. The defendants also argue that the trial justice erred in preventing them from specifically inquiring whether Det. Corley told Green that he could be charged with murder or robbery. These questions are clearly repetitious; Det. Corley had just testified that he had not told Green that he could be charged with any other crimes, except for "drug dealing."

### Hearsay Statements

Oliveira asserts that the trial justice committed reversible error in admitting statements under the coconspirators's exception to the hearsay rule, since these statements were not uttered during the course of and in furtherance of any conspiracy to which Oliveira belonged. Specifically, Oliveira objects to the following statements, allegedly made by Victor St. Hill, that Green recounted in his testimony:

(1) "Do I know anybody selling drugs to?" According to Green, Victor St. Hill made this statement in late 1994 at their first meeting, after not having seen each other for a number of years.

(2) "This is his town. He owned this town."

(3) "You don't remember him? He's the one—."

These statements were admitted pursuant to Rule 801(d)(2)(E) of the Rhode Island Rules of Evidence, which provides that statements made by a coconspirator "during the course of and in furtherance of

the conspiracy" are not inadmissible hearsay. To invoke this provision, "[t]he proponent of the statement bears the burden of establishing, by a preponderance of the evidence, that a conspiracy embracing both the declarant and the defendant existed, and that the declarant uttered the statement during and in furtherance of the conspiracy." *United States v. Piper*, 298 F.3d 47, 52 (1st Cir.2002) (quoting *United States v. Bradshaw*, 281 F.3d 278, 283 (1st Cir.2002)).[13] We first note that Oliveira did not challenge the sufficiency of the evidence on the drug conspiracy charge or his participation in it. Thus, the only question before us is whether the particular statements were made during the course of and in furtherance of the conspiracy. *See United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir.1990) ("[Defendant] does not challenge the sufficiency of the evidence to convict him of conspiracy, and thus implicitly concedes that he eventually did join the conspiracy.").

■■■ "The determination of whether an out-of-court statement furthers a conspiracy to such an extent as to justify admissibility under Rule 801(d)(2)(E) is a preliminary question of fact that must be resolved by the trial judge." *Piper*, 298 F.3d at 54 (citing *Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)). "We review the trial court's determination that statements were coconspirator statements under the clear error standard." *United States v. Marino*, 277 F.3d 11, 25 (1st Cir.2002); *see also United States v. Mojica–Baez*, 229 F.3d 292, 304 (1st Cir.2000), *cert. denied*, 532 U.S. 1065–66, 121 S.Ct. 2215, 150 L.Ed.2d 209 (2001).

■■■ Turning to the first statement—Victor's inquiry of Green about finding a supplier of drugs—we have little need to pause. At trial, Oliveira's counsel objected to the admission of the statement, arguing that there was "no evidence of a conspiracy between [Victor and Oliveira]." On appeal, Oliveira continues to insist that the statement should not have been admitted as a coconspirator's statement because "Oliveira was in no way involved * * * at that juncture." Under Rule 801(d)(2)(E), a conspirator's statement is admissible against other conspirators, such as Oliveira, who join the conspiracy after the statement is made. *See United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746, (1948) ("With [a] conspiracy thus fully established, the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy."); *United States v. Brown*, 943 F.2d 1246, 1255 (10th Cir.1991) ("The prevailing view among the circuits is that previous statements made by co-conspirators are admissible against a defendant who subsequently joins the conspiracy."); *Sophie*, 900 F.2d at 1074 ("Under Rule 801(d)(2)(E), a conspirator's statement is admissible against conspirators who join the conspiracy after the statement is made."); *United States v. Baines*, 812 F.2d 41, 42 (1st Cir.1987) (affirming admission of statements of coconspirators made before defendant joined the conspiracy); *United States v. Holder*, 652 F.2d 449, 451 (5th Cir.1981) ("An otherwise admissible declaration of one coconspirator is admissible against members of the conspiracy who joined after the statement was made."); *United States v. Ramirez*, 482 F.2d 807, 816 (2d Cir.1973) ("an otherwise admissible declaration of one co-conspira-

---

**13.** "Rule 801(d)(2)(E), which became effective in 1987, is identical to its Federal counterpart and codifies our own common law." *State v. Burke*, 574 A.2d 1217, 1228 (R.I.1990).

tor is admissible against members of the group who joined after the statement was made"). We cannot say that the trial justice was clearly wrong in admitting the statement. The statement was made in the presence of Amita, another member of the conspiracy, and clearly was an attempt to find a supplier from whom to purchase drugs, which was an object of the conspiracy, in which Oliveira later joined.

 Turning to the second statement—Victor's statement to Green that "This is his town. He owned this town."—we also hold that it was not clear error for the trial justice to admit this statement.[14] Oliveira contends that the statement was not in furtherance of the conspiracy because it was an "attempt to bully and intimidate Green by portraying [Victor] as the premier kingpin in Providence." To be in furtherance of the conspiracy, "[t]he statement need not have been made exclusively, or even primarily, to further the conspiracy." *United States v. Powers*, 75 F.3d 335, 340 (7th Cir.1996); *see also Piper*, 298 F.3d at 54 ("To be deemed 'in furtherance,' a statement 'need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way.'"). "Rather, the record need only contain some reasonable basis for concluding that the statement in question furthered the conspiracy in some respect." *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir.2000). In this case, to further the objectives of the conspiracy, Victor had to be sure that Green, the middleman between Victor and his supplier, Bolden, maintained loyalty and obedience. Here there is a reasonable basis to conclude that Victor made the statement to Green to prevent him from exiting the conspiracy, from stealing from the conspiracy, or from attempting to distribute drugs in Providence outside the conspiracy. *See id.* (statements intended to preclude "internecine competition" or to prevent the conspiracy from becoming a "house divided against itself" are made in furtherance of the conspiracy); *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir.1995) (statements made to "control damage to the conspiracy are made in furtherance of the conspiracy").

 Finally, we also hold that it was not clear error for the trial justice to admit the third statement—Victor saying to Green about Oliveira "You don't remember him? He was the one—." Oliveira's contention that this statement should not have been admitted because it was not in furtherance of the conspiracy is unavailing. The trial justice, in allowing the statement into evidence, found that the statement had been made in furtherance of the conspiracy, although he did not offer support for his conclusion. After reviewing the evidence, we hold that there was a reasonable basis to conclude that the statement was made in furtherance of the goal of the conspiracy, *viz.*, the acquisition of drugs. Similar to the second statement, it appears that the third statement was made to ensure that Green did not waver in his loyalty to his coconspirators. By reminding Green of Oliveira's presence, and implying that Oliveira was one of the gunmen involved in the previous incident, Victor ensured that Green would think twice before attempting to swindle or steal from the other members of the conspiracy, thus furthering the goals of the conspiracy.

### Motion to Suppress Eyewitness Identification

 Oliveira asserts that the trial justice erred in denying his motion to sup-

---

14. We do not address Oliveira's request for a cautionary instruction, as this request clearly was withdrawn at trial.

press the out-of-court and in-court eyewitness identification by Green because the procedures used by the police were impermissibly suggestive and resulted in an irreparably mistaken identification, in violation of his due process rights. On appeal, Oliveira asserts that the identification procedure was unnecessarily suggestive because of purported dissimilarities between the individuals depicted in the photographs contained in the photo array and dissimilarities between the photographs themselves. We decline to address this argument. Oliveira never made these arguments to the trial justice at the suppression hearing. Instead, he contended that suggestive statements Det. Corley made to Green during the identification process rendered the photo array unduly suggestive. "According to our well settled 'raise or waive rule,' a litigant must make a timely and appropriate objection during the lower court proceedings before this Court will indulge the issue on appeal." *State v. Grant,* 840 A.2d 541, 546 (R.I. 2004).[15] "[A]ssignments of error must be alleged with sufficient particularity so it will call the trial justice's attention to the basis of the objection." *Id.* at 546–47.

### Detective Corley's Testimony on Redirect Examination

 Oliveira contends that the trial justice committed reversible error in permitting Det. Corley to testify that he relied on information other than Green's description in selecting Oliveira's picture for the photo array. During direct examination, Det. Corley testified that he used the description Green gave him to prepare the photo array containing a photograph of Oliveira. On cross-examination, defense counsel attempted to emphasize the paucity of information that Green actually provided, specifically that the suspect was a Spanish male with sideburns down to his chin, a small mustache, and short, flat hair. His questions further suggested that the facial hair features could be altered. On redirect examination, the state asked Det. Corley "simply, please, yes or no, did you rely on anything other than the description given to you by Horace Green when you selected [ ] Oliveira's picture for that photopack, yes or no?" Defense counsel's objections were overruled, and Det. Corley replied "[y]es." Defense counsel then moved to pass the case, which the trial justice denied.

Oliveira contends that this testimony was "irrelevant and inflammatory" and its admission constitutes reversible error. Oliveira asserts that the testimony was not relevant to any issue that the jury had to resolve, which was whether the array itself or the identification procedure was suggestive. Moreover, Oliveira contends that, even if relevant, the probative value was outweighed by the danger of unfair prejudice, because it invited the jury to speculate as to what the extrinsic evidence may have consisted of.

The state counters that the permitted testimony was within the proper scope of the state's redirect and was relevant to rehabilitating the credibility of the photo array that Oliveira had attempted to discredit on cross-examination. We agree.

 "[A] determination of relevancy made by a trial justice will not be

---

15. We have recognized a narrow exception to the "raise or waive rule" when: (1) the error complained of is not harmless, (2) the record is sufficient to permit a determination of the issue, (3) the mistake is one of constitutional import, and (4) counsel's failure to raise the issue is attributable to a novel rule of law that counsel could not reasonably have known about during the trial. *State v. Rupert,* 649 A.2d 1013, 1016 (R.I.1994). There is no suggestion that the instant situation falls within this narrow exception.

disturbed on appeal unless an abuse of discretion is shown." *State v. Mora,* 618 A.2d 1275, 1280 (R.I.1993). "Such rulings will not be disturbed on review, 'absent a clear abuse of discretion that results in prejudice to the defendant.'" *State v. Oliveira,* 774 A.2d 893, 921 (R.I.2001) (quoting *State v. Tassone,* 749 A.2d 1112, 1117 (R.I. 2000)). A trial justice's ruling on a motion to pass a case, or a motion for a mistrial, "is entitled to great weight and will not be disturbed on appeal unless the trial justice is clearly wrong." *State v. Luciano,* 739 A.2d 222, 228 (R.I.1999). "The trial justice 'has a front-row seat at the trial' and is in the best position to determine whether a defendant has been unfairly prejudiced." *Id.* (quoting *State v. Gomes,* 690 A.2d 310, 317 (R.I.1997)). In considering a motion for a mistrial, the trial justice must determine whether the evidence would cause the jurors to be so inflamed as to make them unable to decide the case on the basis of the evidence presented. *State v. Mastracchio,* 672 A.2d 438, 444 (R.I.1996).

It is our opinion that Det. Corley's testimony was relevant to correct the misleading impression created by Oliveira's questioning of Det. Corley, which indicated that he had relied solely on Green's physical description of Oliveira to assemble the photo array. Oliveira's questioning opened the door to this issue in such a fashion as to invite the prosecutor's response. The trial justice did not abuse his discretion in allowing the state to question Det. Corley, in a very limited manner, to correct the inaccurate impression created by Oliveira's line of questioning.

 Similarly, the trial justice did not abuse his discretion in denying Oliveira's motion to pass the case. Rule 403 of the Rhode Island Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Although there exists no precise formula for determining the prejudicial effect of a statement, we 'evaluate its probable effect upon the outcome of the case by examining the remark in its factual context and determining whether this remark reasonably tended to increase' the probability of an issue of fact or law that is of consequence to the outcome of the case." *State v. Dyer,* 813 A.2d 71, 74 (R.I.2003) (quoting *State v. Ortiz,* 609 A.2d 921, 929 (R.I. 1992)). In this situation, the probative value of Det. Corley's testimony is made evident by the fact that its admission resolved the potentially misleading line of questioning that Oliveira initiated. The challenged testimony on this same subject did not so prejudice defendant as to warrant a mistrial. The trial justice limited the redirect examination on this subject to a "yes or no" question, and prohibited the state from eliciting the other information Det. Corley relied on in selecting Oliveira's photo. The trial justice's handling of this issue was reasonably calculated to correct the misleading impression created by Oliveira's questioning, while also limiting any prejudice to Oliveira.

### Conclusion

For the aforementioned reasons, we reverse the judgment of the Superior Court with respect to the felony-murder convictions, and affirm the judgment with respect to the conspiracy convictions. The record shall be remanded to the Superior Court.

Justice GOLDBERG and Justice ROBINSON did not participate.