**STATE**

v.

**Antonio CAPRIO, Jr.**

83–88–C.A.

Supreme Court of Rhode Island.

May 23, 1984.

---

Dennis J. Roberts II, Atty. Gen., Charles M. Nystedt, Sp. Asst. Atty. Gen., for plaintiff.

John A. MacFadyen III, Providence, for defendant.

## OPINION

KELLEHER, Justice.

This appeal follows a verdict by a Superior Court jury which found the defendant, Antonio Caprio (Caprio), guilty of having committed arson in the first degree. Such a crime is defined in G.L.1956 (1981 Reenactment) § 11–4–2 as follows:

"Arson—First degree—Any person who knowingly causes, procures, aids, counsels or creates by means of fire or explosion, a substantial risk of serious physical harm to any person or damage to any building the property of himself or another, whether or not used for residential purposes, which is occupied or in use or which has been occupied or in use during the six (6) months preceding the offense or to any other residential structure, shall, upon conviction, be sentenced to imprisonment for not less than five (5) years and may be imprisoned for life and shall be fined not more than five thousand dollars ($5,000) or both; provided, further, that whenever a death occurs to a person as a direct result of said fire or explosion or to a person who is directly involved in fighting said fire or explosion, imprisonment shall be for not less than twenty (20) years."

Caprio's appeal arises from the denial by the trial justice of his motion for a new trial and his motion for judgment of acquittal. The crux of those motions was a challenge to what constituted the proper meaning, under the statute, of the terms "substantial risk of serious physical harm to any person" and "occupied or in use * * * during the six months preceding the offense."

The fire that is the subject of these proceedings occurred on August 11, 1981, at 43 Quonset Avenue in Warwick, Rhode Island. The structure, a single-family home, was located in a residential area of Warwick's Oakland Beach section. Caprio, who at that time was the principal of one of Providence's high schools, was also a part owner of several pieces of residential real estate. Forty-three Quonset Avenue was one of his holdings.

At trial the state's key witness was Jeanne Burns (Burns). Burns was a teacher and a subordinate of Caprio's. She was with Caprio on the night of the fire. She had gone to his home in another section of Warwick to discuss with her principal a problem involving one of the school's students. Burns arrived late in the afternoon and so stayed for dinner; but before dessert was served, Caprio asked her to drive him to the Quonset Avenue property. She agreed to act as his chauffeur.

Burns told the jury that she watched Caprio enter the Quonset Avenue premises through a side door and that although the house was dark, she could see the gleam of Caprio's flashlight through a window. He soon left the house, returned to the car, and asked Burns for a screwdriver. She allowed him to forage through the car's trunk, where he found a fishing knife with which he returned to the house.

After a lapse of a few minutes, Caprio returned to the car and said to Burns, "Let's go." Apparently Burns did not follow this command quickly enough, for he anxiously told Burns, "We have to get the hell out of here. I just set the place on fire."

Burns was, at first, incredulous, but Caprio insisted that the deed had been done. She suggested that they return to put it out, but Caprio said, "No, it's too late." They returned to Burns's home, where the police, alerted by the description of Burns's vehicle,[1] were waiting for the couple.

---

1. Once the fire apparatus appeared on the scene, observant neighbors quickly alerted the fire-

fighters to the suspicious activities that had taken place at 43 Quonset Avenue just prior to the

The indictment charged that Caprio "did knowingly cause, procure, aid, counsel and create by means of fire substantial risk of serious physical harm to firefighters responding to fight said fire at and damage to the building located at 43 Quonset Ave. which was occupied and in use during the six (6) months preceding August 11, 1981." Caprio asserts that firefighters are not within the targeted class of protected individuals under § 11–4–2 and that the mere fact that the house was occupied at some point in time in the preceding six months is not sufficient occupation under the statute.

 In answering these questions, we initially refer to the body of our case law which establishes the appropriate standards for statutory interpretation. We are obligated to give effect to all of the act's provisions, with no sentence, clause, or word construed as unmeaning or surplusage. *In re Rhode Island Commission for Human Rights*, 472 A.2d 1211 at 1212 (R.I., 1984). Where one provision is part of the overall statutory scheme, the legislative intent must be gathered from the entire statute and not from an isolated provision. *Id.* at 1212.

Rhode Island's statutory-arson scheme seeks to rectify a variety of problems caused by the common-law definition of the crime. At common law, arson was defined very simply as "the malicious burning of the dwelling of another." Perkins, *Criminal Law* at 216 (2d ed. 1969). The crime was punished because of the risk it created to habitation. *Id.* at 223.

However, this definition did not serve to punish for the dangers that exist for those who live at, or nearby, the damaged structure. Therefore, the current Rhode Island scheme punishes for the commission of the crime according to the risk involved in a variety of factual situations. In addition to first-degree arson defined above, second-degree arson punishes for the destruction by fire or explosion of an unoccupied building,[2] and fourth-degree arson punishes for the destruction of another's personal property valued in excess of $100.[3]

Caprio argues that it was not the intent of the Legislature to punish for any act of arson as first-degree arson merely because of the risk to a firefighter who responds to the conflagration. The defendant insists that if this were so, any degree of the crime could be raised to the first degree merely by the arrival of members of the fire department.[4] Caprio suggests that if the Legislature had intended to include firefighters, it would have done so explicitly.

Various states responded in a variety of ways to the problem with the crime of arson as defined in the common law. Arkansas includes in its arson definition the starting of a fire or an explosion with the purpose of destroying or damaging the property of another "if the actor thereby negligently creates a risk of death or serious physical injury to any person."[5] Connecticut's concern is with those situations in which "the actor is either aware that a person is present in or close to such building, or his conduct manifests an indifference as to whether a person is present in or close to such building."[6] Kentucky's scheme is designed to punish those who have "reason to believe that another person, not an accomplice, is present in the building at the time."[7] Finally, Wash-

---

outbreak of the fire. This information included the license-plate number of Burns's car.

**2.** General Laws 1956 (1981 Reenactment) § 11–4–3.

**3.** Section 11–4–5.

**4.** However, the statute has other overlapping features. For example, fourth-degree arson could result from the burning of an automobile; yet the danger inherent in the response of fire-

fighters to such a fire could clearly warrant a first-degree charge.

**5.** Ark.Stat.Ann. § 41–1902 (1977).

**6.** Conn.Gen.Stat.Ann. § 53(a)–111 (West 1972).

**7.** Ky.Rev.Stat.Ann. § 513.020 (Bobbs-Merrill 1975).

ington specifically punishes as first-degree arson the commission of an act that "is manifestly dangerous to any human life including firemen." [8] Therefore, the Rhode Island Legislature had a wide range of options from which to choose when devising its own statute.

Although there are a variety of statutes, there is a dearth of discussion on the issue with which we are confronted. Louisiana defines aggravated arson as the intentional damage by fire or explosion to a structure "whereby it is foreseeable that human life might be endangered." [9] In *State v. Bonfanti*, 254 La. 878, 227 So.2d 916 (1969), the Louisiana Supreme Court was confronted with the same question with which we now wrestle.

The Louisiana court held that "human life" did not include firemen, and two reasons supported this judgment. *Id.* at 880–81, 227 So.2d at 918. The court felt that it would be an unwarranted expansion of pre-existing Louisiana law to hold otherwise and that all other arson violations would be inoperative since firefighters can be expected to come to the scene of any fire. *Id.* at 882, 227 So.2d at 918.

However, our analysis of the Rhode Island law does not indicate that §§ 11–4–1 through –10 are restricted to their legal history. To the contrary, the statute is designed to depart from the strictures of the common law.

Furthermore, the Washington court has not encountered the difficulties of which Caprio and Louisiana complain. Washington specifically includes "firemen" and also has several degrees of arson, including reckless burning. Yet firefighters could respond to any of those situations, and the more severe penalty would result. "[E]xperience teaches that one of the certainties attendant upon a hostile fire is that firemen will be called and will come. Danger inheres in fire fighting." *State v. Levage*, 23 Wash.App. 33, 35, 594 P.2d 949, 950 (1979).

Our statute, like the Washington statute, places potential arsonists on notice that the foreseeable consequences of their actions will give them access to greater crimes, with greater penalties. This, of course, does not mandate the conclusion at which Caprio arrives. Not all fires that have a fire-personnel response will be susceptible of the first-degree charge. The statute requires a *substantial* risk of *serious* physical harm. Each of these elements must be proved by the state.

This court has given the broadest scope to the "any person" language in *State v. Mann*, 119 R.I. 720, 382 A.2d 1319 (1978). The defendant in *Mann* was charged with violating the Controlled Substances Act, G.L.1956 (1968 Reenactment) § 21–28–4.-01(c). That statute prohibits "*any person* knowingly or intentionally to possess a controlled substance" unless legally obtained. The defendant claimed that he was exempted from the act's language since he was a licensed osteopath. We rejected this claim. "The language is clear. It is well settled that, in the absence of ambiguity, words used in a statute must be given their plain and ordinary meaning unless a contrary intention appears on the face of the statute. *Andreozzi v. D'Antuono*, 113 R.I. 155, 158, 319 A.2d 16, 18 (1974). We conclude, therefore, that 'any person' * * * includes physicians." *State v. Mann*, 119 R.I. at 724, 382 A.2d at 1321.

■ Given this precedent, we likewise conclude that the very breadth of the term "any person" defies the exclusion of any class of persons. That term is so broad as to require exclusion, not specific inclusion. The last line of the statute indicates precise knowledge of the probability that firefighters will most likely come to the scene of a fire. The Legislature made a conscious choice that if a firefighter were, in fact, placed in substantial risk of serious harm as the result of an intentionally set fire, first-degree arson is the appropriate crime.

---

**8.** Wash.Rev.Code Ann. § 9A–48.020 (1977).

**9.** La.Rev.Stat.Ann. § 14:51 (West 1974).

For this court to limit such a choice would be a serious encroachment on the legislative prerogative.

In construing the appropriate definition of the term "during the six (6) months preceding the offense," we shall apply the same set of standards as those applied above. The requirement of occupancy during those six months was also a statutory response to common-law shortcomings. As mentioned previously, arson was an offense against habitation. Therefore, if no one was living at the structure, or if the structure was abandoned, arson would not be the appropriate crime. Perkins, *Criminal Law* at 223. Since this arguably left a wide variety of structures outside the common-law definition, including office buildings and vacation homes, legislatures sought to statutorily fill the gap. *See, e.g., People v. Losinger,* 331 Mich. 490, 50 N.W.2d 137 (1951).

Section 11–4–2 changes those results. Arson in the first degree now encompasses more than merely those fires that destroy only those dwellings used for habitation. Caprio claims that the state's interpretation of the phrase, finding the first-degree statute applicable in those situations in which the structure is in use only once in the previous six months, would unduly expand the legislation. He asserts that this interpretation will cause the first-degree charge to be appropriate even though the burned structure had been abandoned for five months.

This complaint is a complaint with the time line drawn by the Legislature. The Legislature clearly felt that the public policy of this state would be to encompass as much activity within the first-degree arson section as was reasonably related to the protection of human life. The experience of the instant case demonstrates the sensibility of this action. Forty-three Quonset Avenue was used as rental property, and it was located in a residential neighborhood. It is conceivable that such a dwelling would be unoccupied in the interim during which one tenant was moving in and another moving out. Yet, these temporary situations do not diminish the danger to the surrounding homes.

■■■ Again, the Legislature has made its choice, and that choice is clear. The word "during" does not mean a continuous occupancy throughout the entire six-month period; rather, any point during the six-month period suffices. It is not the function of this court to quarrel with the Legislature when it has discharged its function with clarity.

■■ Now that the proper interpretation of the language has been established, we turn to the trial justice's decisions on the new trial and the acquittal motions. When a motion for judgment of acquittal is made, the trial justice may consider only that evidence which the state maintains indicates guilt beyond a reasonable doubt. The trial justice may not consider the credibility of the witnesses or the weight of the evidence and may only view the evidence in the light most favorable to the state. *State v. Roddy,* R.I., 401 A.2d 23, 32 (1979). Caprio claims that his motion for a judgment of acquittal should have been granted since "any persons" does not include "firefighters" and there was no evidence of occupation during the six months preceding the fire.

■■ However, the state presented ample evidence that the fire was still burning when the firefighters arrived and that heavy smoke conditions existed within the structure. Furthermore, when the flames had finally been extinguished, firefighting personnel entered the building to check for fire hidden within the structure's partitions. The hazard inherent in this situation, when viewed in the light most favorable to the state, clearly creates an implication that the firefighters were confronted with a substantial risk of serious harm.

■■ We shall also uphold the trial justice's decision about the occupancy question since there was ample evidence in the record indicating that tenants occupied Caprio's property until three or four days

prior to the time the firefighting apparatus arrived at 43 Quonset Avenue.

 In passing upon a motion for a new trial, the trial justice, exercising his independent judgment, will weigh the evidence and the credibility of the witnesses. If he determines that the evidence is sufficient for a jury to conclude that guilt exists beyond reasonable doubt, the justice will deny the motion. *State v. McGranahan*, R.I., 415 A.2d 1298, 1302 (1980). This function was ably exercised at trial. The trial justice concluded that the elements of § 11–4–2 were satisfied; that the story told by Miss Burns was credible; but that the testimony of Mr. Caprio, explaining that the fire was an accident and that his wish to leave the scene was the result of panic, was not. Since this decision complies with the new-trial requirements, we will not overturn it.[10]

The final issue of this appeal relates to a motion to pass made by Caprio during the course of the trial and denied by the trial justice. "[A] decision on a motion to pass a case and declare a mistrial lies within the sound discretion of the trial justice." *State v. Collazo*, R.I., 446 A.2d 1006, 1009 (1982).

The question on which Caprio made his motion was part of the state's proof of motive. Caprio never submitted a claim to an insurance company for the damage to the Quonset Avenue property. However, he did transfer the insurance policy to a cousin. Several months after the original fire, a second fire occurred at the location, and for this fire the cousin submitted a claim. However, the trial justice would not allow evidence of this claim to come before the jury.

Nevertheless, Caprio allowed a copy of the insurance policy, with the cousin's name, to be submitted into evidence. The state was allowed to ask the circumstances surrounding the transfer until finally the state inquired of Caprio, "Now on or after the time of that fire, what, if anything,

[did] your cousin do with respect to that fire loss?" The objection to this question was sustained, but Caprio moved to pass the case, arguing that the question improperly put the possibility of motive through conspiracy with the cousin before the jury.

This question reflects an overzealousness on the part of the prosecutor which should not go unnoticed. We find it hard to believe that he was unaware that he was inviting the risk of a mistrial or reversal.

 In considering the denial of the motion to pass, we must determine whether the question raised creates such prejudice that it is inexpiable and "totally extraneous to the issues in the case and tend[s] to inflame and arouse the passions of the jury." *State v. Mancini*, 108 R.I. 261, 273–74, 274 A.2d 742, 748 (1971). This court will not overturn the decision of the trial justice on a motion to pass unless it is clearly wrong. *State v. Pailin*, 114 R.I. 725, 729, 339 A.2d 253, 255 (1975). The trial justice decided that the question did not create the conspiracy implication and therefore denied the motion. We agree with this conclusion but wonder why the inquiry was posed in a situation, as here, in which the evidence at trial, especially that from Miss Burns, constituted overwhelming proof of Caprio's guilt.

The defendant's appeal is denied and dismissed, the judgment entered in the Superior Court is affirmed, and the case is remanded to Superior Court for further proceedings.

---

**10.** Caprio also claims that the instructions given to the jury on these issues were inadequate. However, since counsel lodged no objections at the time they were given, we shall not now review them. *State v. Williams*, R.I., 432 A.2d 667 (1981).