**In re Paul HARRISON.**

No. 2009–22–M.P.

Supreme Court of Rhode Island.

April 29, 2010.

Aaron L. Weisman, Department of Attorney General, for Petitioner.

Marie T. Roebuck, Office of The Public Defender, for Respondent.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

1. Although we ordinarily refrain from using a minor's full name in Family Court matters, Harrison's name is in the public domain by nature of G.L. 1956 § 14–1–7.3(h).

2. Section 14–1–7.1 provides:

## OPINION

Justice FLAHERTY, for the Court.

The question before this Court is whether a Family Court justice retains the authority to place a juvenile in a facility other than the Training School when that juvenile has been certified under G.L. 1956 § 14–1–7.3 and sentenced to serve the period of the child's minority "in the training school for youth in a facility to be designated by the court." We granted the state's request for review by writ of certiorari of a Family Court order placing a minor at Ocean Tides Residential Treatment Program (Ocean Tides), a facility dedicated to the treatment of male adolescents. This case came before the Supreme Court for oral argument on February 9, 2010, pursuant to an order directing both parties to appear and show cause why the issues raised by this petition should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown and that the issues raised by this petition should be decided at this time. For the reasons set forth below, we affirm the order of the Family Court.

## I

### Facts and Travel

In December 2007, when he was sixteen years old, Paul Harrison sexually assaulted a young woman, whom he described as a friend.[1] Because of the serious nature of the allegations, the state requested that the Family Court waive its jurisdiction over Harrison, so that he could be tried as an adult.[2] But, on June 16, 2008, after an

"(a) Upon a motion by the attorney general pursuant to § 14–1–7, the court shall conduct a hearing at which it shall be the duty of the attorney general to produce evidence to enable the court to determine:

agreement apparently had been reached, the state requested that Harrison's waiver hearing be converted to a certification hearing. A Family Court justice certified him and, after Harrison pleaded nolo contendere to first-degree sexual assault, the justice sentenced him to fifteen years imprisonment at the Adult Correctional Institutions, with five years to be served at the Training School and ten years suspended.[3]

On January 12, 2009, Harrison appeared before the Family Court for a periodic review of his progress. At that hearing, the state and the Public Defender agreed that Harrison was doing well at the Training School; he had received a GED, had made progress in his sex-offender treatment, and he was free of serious disciplinary citations. The Public Defender, citing the impressive nature of Harrison's progress, suggested that when the court next reviewed his case a few months later, it might consider him for a "step-down program," such as a group-home placement.[4] When the Family Court justice inquired about which program might be appropriate, the Public Defender offered several possibilities, and she also mentioned that Ocean Tides had earlier accepted him into its program. Without further inquiry, the Family Court justice ordered Harrison's immediate transfer to Ocean Tides as a Temporary Community Placement (TCP). He explained to Harrison, "[y]oung man, you're doing very well. That's why I gave you a break, you understand?"

On January 16, 2009, the state filed a motion asking the court to reconsider its order, which the Family Court justice denied. On January 21, 2009, the state requested a stay in Family Court.[5] It also filed a petition for certiorari and a motion to stay the Family Court justice's order in this Court. We granted the state's petition for writ of certiorari, and on February 9, 2009, we stayed the Family Court's order, noting that the justice "neither considered any testimony or other evidence nor offered any legal rationale in rendering his decision." As a result, we remanded the

"(1) That probable cause exists to believe that the offense charged has been committed and that the child charged has committed it, unless the proof has been elicited at a prior hearing on detention of the juvenile and the findings have been made by the same justice of the family court who is conducting the waiver proceeding; and

"(2) That the child's past history of offenses, history of treatment, or the heinous or premeditated nature of the offense is such that the court finds that the interests of society or the protection of the public necessitate the waiver of jurisdiction of the court over the child.

"(b) If the court finds that subdivisions (a)(1) and (a)(2) of this section have been proven by a preponderance of evidence, it may waive jurisdiction over the child and refer the child to the appropriate adult court to be tried for the offense as an adult.

"(c) A waiver of jurisdiction over a child pursuant to this section shall constitute a waiver of jurisdiction over that child for the offense upon which the motion is based as well as for all pending and subsequent offenses of whatever nature, and the child shall be referred to the court which would have had jurisdiction if the offense had been committed by an adult. In the event that the child is acquitted of the offense for which the waiver has been sought, the waiver shall be vacated."

3. We do not have the record of the June 16, 2008, hearing at which Harrison was certified, pleaded nolo contendere, and was sentenced, and we presume that there was compliance with the statutory requirements of § 14-1-7.2.

4. Although perhaps a bit ambiguous, the state also seemed to have contemplated a future placement outside of the Training School for Harrison. The prosecutor stated that although Harrison was "in the beginning stages of his treatment," she believed that "eventually he can be transitioned."

5. The Family Court justice reserved judgment on the state's motion to stay.

matter for an evidentiary hearing about Harrison's appropriate placement and ordered the Family Court justice to issue a decision that contained "the necessary findings of fact and rulings on pertinent legal issues raised by the parties' counsel."

On February 23, 2009, on remand, the Family Court heard testimony from Brother Joseph Shafer, director of social services for Ocean Tides. He testified that Harrison was a good candidate for the facility's sex-offender program. He also said that Ocean Tides previously had accepted certified youths into its program as TCPs, including one who had been convicted of attempted murder. The state presented no evidence whatsoever at the hearing, and it dedicated the majority of its cross-examination of Brother Shafer to establishing that Ocean Tides was not a locked facility and that it had less rigorous supervision than the Training School.

The Family Court justice issued his decision on February 25, 2009. After finding Brother Shafer's testimony to be credible, the justice addressed the legal arguments of the parties. He rejected the state's argument that transferring a certified minor to Ocean Tides as a TCP amounted to a modification of the minor's sentence as set forth in § 14–1–42.[6] Rather, the Family Court justice determined that the "juvenile is still under sentence at the Rhode Island Training School" even when he is sent to Ocean Tides as a TCP. He further found that the sex-offender program at Ocean Tides was "particularly suited for this individual." Accordingly, the Family Court justice ordered Harrison to be sent to Ocean Tides as a TCP. We stayed that

---

**6.** Section 14–1–42 provides in relevant part:

"(c) In any case where a child has been certified and adjudicated pursuant to §§ 14–1–7.2 and 14–1–7.3, and sentenced pursuant to § 14–17.3(a)(2) [*sic*], the court shall schedule a review of the child's case thirty (30) days prior to the child's eighteenth birthday or thirty (30) days prior to the one-year anniversary of the imposition of the sentence, whichever is greater. It shall be the responsibility of the attorney general or of the law enforcement agency making the arrest to notify the victim or victims of the crime for which the juvenile was certified and adjudicated of the pendency of the hearing and afford them the opportunity to be heard. The court shall not hear or determine any other motion for modification of the order of certification, except as provided for in this section. At that time and upon proof by clear and convincing evidence that demonstrates that the person has made sufficient efforts at rehabilitation and that the modification of the order of certification would not pose a threat to the safety of the public, the court may suspend, but shall not vacate, the balance of the sentence.

"(d) In the event that the court, after a hearing, determines that it has not been demonstrated by clear and convincing evidence that the person has made sufficient efforts at rehabilitation and that the modification of the order of certification entered pursuant to § 14–1–7.3(a)(2) would pose a threat to the safety of the public, the court shall order either:

"(1) That the person be remanded to the training school for youth until further hearing to be held no later than one year thereafter in accordance with subsection (c) of this section; or

"(2) That the jurisdiction of the sentence be transferred to the department of corrections and that the balance of the sentence be served in facilities under the control of the department.

"(3) In any case where a child has been certified and adjudicated pursuant to § 14–17.3(a)(2) [*sic*], upon motion by the attorney general and/or the department of children, youth and families, the court shall conduct a hearing to consider modification of the order of certification if the family court determines that the individual poses a serious threat to the safety of the public, other residents at the training school and/or training school staff. Upon that finding the court may order that the jurisdiction of the sentence be transferred to the department of corrections and that the balance of the sentence be served in facilities under the control of the department."

order on February 27, 2009, but vacated the stay on March 12, 2009, and ordered that Harrison be placed at Ocean Tides.[7]

## II

## Standard of Review

"When presented with questions of statutory interpretation this Court engages in a *de novo* review." *State v. La-Roche,* 925 A.2d 885, 887 (R.I.2007) (citing *State v. Oliveira,* 882 A.2d 1097, 1110 (R.I. 2005)). "As we have noted previously, 'when the language of a statute is clear and unambiguous, [this Court] must interpret the statute literally and must give the words of the statute their plain and ordinary meanings.'" *Id.* (quoting *Oliveira,* 882 A.2d at 1110). "Moreover, when we examine an unambiguous statute, 'there is no room for statutory construction and we must apply the statute as written.'" *Id.* "It is only when confronted with an unclear or ambiguous statutory provision that this Court will examine the statute in its entirety to discern the legislative intent and purpose behind the provision." *Id.* at 888 (citing *Oliveira,* 882 A.2d at 1110). "When language of a statute can be given more than one interpretation, 'legislative intent must be gathered from the entire statute and not from an isolated provision.'" *Arnold v. Lebel,* 941 A.2d 813, 819 (R.I.2007) (quoting *State v. Caprio,* 477 A.2d 67, 70 (R.I.1984)). Moreover, "no construction of a statute should be adopted that would demote any significant phrase or clause to mere surplusage." *State v. Clark,* 974 A.2d 558, 572 (R.I.2009) (quoting *State v. DeMagistris,* 714 A.2d 567, 573 (R.I.1998)).

## III

## Discussion

The overarching purpose of the statutory scheme relating to juvenile justice is to rehabilitate miscreants who have not reached the age of majority. *See In re Richard A.,* 946 A.2d 204, 210 (R.I.2008) ("The primary goals of the juvenile-justice system are protection, rehabilitation, and treatment of the offender, whereas the criminal system seeks to punish the offender."); *State v. Day,* 911 A.2d 1042, 1048 (R.I.2006) ("The philosophy underlying the movement to create juvenile justice systems, separate from the adult criminal system, stemmed from the belief that people under a certain age inherently were less culpable than were adults."). Those minors who have committed an act that would be considered to be a crime if committed by an adult may be adjudicated wayward [8] or delinquent.[9] *See* § 14–1–5.

---

7. We further ordered that Harrison be confined to the Ocean Tides premises, and that he be ineligible for weekend passes pending our decision in this case.

8. Section 14–1–3(9) defines "[w]ayward" as any child,
    "(i) Who has deserted his or her home without good or sufficient cause;
    "(ii) Who habitually associates with dissolute, vicious, or immoral persons;
    "(iii) Who is leading an immoral or vicious life;
    "(iv) Who is habitually disobedient to the reasonable and lawful commands of his or her parent or parents, guardian, or other lawful custodian;
    "(v) Who, being required by chapter 19 of title 16 to attend school, willfully and habitually absents himself or herself from school or habitually violates the rules and regulations of the school when he or she attends; or
    "(vi) Who has on any occasion violated any of the laws of the state or of the United States or any of the ordinances of cities and towns, other than ordinances relating to the operation of motor vehicles."

9. Section 14–1–3(5) defines "[d]elinquent" as,
    "any child who has committed any offense which, if committed by an adult, would constitute a felony, or who has on more

In such cases, the Family Court has at its disposal a wide range of dispositions to accomplish its statutory mandate of rehabilitation, ranging from probation and counseling at one end of the spectrum to incarceration at the Training School at the other.

Yet, the delinquency and waywardness process is not an adequate means of addressing all juvenile wrongdoing. There are also those youths who have perpetrated such heinous acts or who may be so incorrigible, even at a young age, that they are not amenable to rehabilitation within the juvenile system. To protect society from these more or less hopeless cases, the Family Court may waive a child from its jurisdiction so that he may be tried as an adult and punished accordingly upon a finding of guilt. Section 14–1–7.1. In 1990, as a middle ground between these polar opposites, the General Assembly also provided for certification, the process selected for Harrison.

The certification process is set forth in chapter 1 of title 14 of the General Laws. Section 14–1–7(c) permits the attorney general to institute a certification hearing with respect to any minor "who is charged with an offense which would constitute a felony if committed by an adult." At such a hearing, the attorney general must demonstrate that (1) "[p]robable cause exists to believe that the offense charged has been committed and that the child charged has committed it[, ]" (2) "[t]he child's past history of offenses, history of treatment, or the heinous or premeditated nature of the offense is such that the court finds that the interests of society or the protection of the public necessitate the certification[, ]" and (3) "[t]he jurisdiction of the court but for the exercise of certification is in all likelihood an insufficient period of time in which to accomplish a rehabilitation of the child." Section 14–1–7.2. Certification allows the minor to be tried as an adult in Family Court, but affords the justice with broader options when he imposes a sentence.[10] In the case before us, the Family Court justice opted to "[i]mpose a sentence upon the child for a period in excess of the child's nineteenth birthday to the adult correctional institutions, with the period of the child's minority to be served in the training school for youth in a facility to be designated by the court." Section 14–1–7.3(a)(2).

The nub of the parties' dispute lies in their differing interpretations of the statutory clause "to be served in the training school for youth in a facility to be designated by the court." The state contends that this clause plainly says that a Family Court justice may not place a certified juvenile at Ocean Tides because that facility is outside of the Training School. On the other hand, defendant argues that the

than one occasion violated any of the other laws of the state or of the United States or any of the ordinances of cities and towns, other than ordinances relating to the operation of motor vehicles."

**10.** Section 14–1–7.3(a) provides:
"Upon a finding by the court that the child is subject to certification pursuant to § 14–1–7.2, the court shall afford the child a right to a jury trial, and upon conviction for the offense charged, the court shall sentence the child in accordance with one of the following alternatives:

"(1) Impose a sentence upon the child to the training school for youth until the time that the child attains the age of nineteen (19) years;

"(2) Impose a sentence upon the child for a period in excess of the child's nineteenth birthday to the adult correctional institutions, with the period of the child's minority to be served in the training school for youth in a facility to be designated by the court. However, the sentence shall not exceed the maximum sentence provided for by statute for conviction of the offense."

phrase contemplates and provides the Family Court with discretion with regard to placement, because the Training School consists of merely one long-term facility for boys. Thus, in defendant's view, to require that a certified juvenile must be confined at the Training School would reduce the statutory phrase in § 14–1–7.3(a)(2) "in a facility to be designated by the court" to mere surplusage.

We begin our consideration of this question, as we must, by carefully reviewing the plain language of the specific statute in question. After examining the statute, we believe that the language "to be served in the training school for youth in a facility to be designated by the court" is susceptible to more than one reasonable interpretation. The meaning of the term "the training school" would appear, at the outset, to be reasonably clear. "The training school" would seem to be a singular entity, an impression that is reinforced by the use of the more concrete word "in" rather than the more general "to" to describe a certified juvenile's sentence. Moreover, G.L. 1956 § 42–72–17.2(a) provides a very specific definition of the Training School as "consist[ing] of a youth development center, a youth assessment center and a female correctional treatment facility." However, that seeming clarity is befogged considerably by the clause's next phrase, which adds "in a facility to be designated by the court." Although the Training School is made up of three nominal facilities, a juvenile's long-term placement is determined by gender, leaving no discretion to the Family Court justice. Such a construction, however, would relegate the second phrase of the statutory clause to "mere surplusage." Thus, we must conclude that the statutory language is ambiguous.

Consequently, we must construe § 14–1–7.3 in the context of the entire juvenile justice statutory framework to glean the intent of the legislature when it enacted this ambiguous provision. The state directs us to § 14–1–42, which it maintains supports its position, because that statute provides for strict limitations on the modification of a sentence in the case of a certified child. The state is correct that the provision prohibits a Family Court justice from modifying the sentence of a certified youth until "thirty (30) days prior to the child's eighteenth birthday or thirty (30) days prior to the one-year anniversary of the imposition of the sentence, whichever is greater." Section 14–1–42(c). Further, to modify a sentence, the Family Court justice must be satisfied that clear and convincing evidence "demonstrates that the person has made sufficient efforts at rehabilitation and that the modification of the order of certification would not pose a threat to the safety of the public * * *." *Id.*

We believe, however, that the state's reliance on the language of § 14–1–42 is misplaced, because we do not agree that the placement of Harrison at Ocean Tides is a modification of his sentence under the statute. The use of the term "modification" in this provision is somewhat misleading. In fact, § 14–1–42 applies to the limited circumstances in which "the court may suspend, but shall not vacate, the balance of the [juvenile's] sentence." *See In re Nicholas V.,* 622 A.2d 447, 449 (R.I.1993) ("Section 14–1–42 provides specific procedures for suspending the rest of a sentence imposed pursuant to § 14–1–7.3(b)"). Because the Family Court justice did not modify Harrison's sentence within the meaning of § 14–1–42, this provision is not controlling.

Rather, we believe that § 14–1–36.1, entitled "Release from training school," provides the best vehicle for resolving this

dispute.[11] The state argues that § 14–1–36.1(b) applies only to youths found to be delinquent or wayward and does not contemplate community placement for certified youths. We disagree.

A review of the history of § 14–1–36.1 is instructive. Before 2008, § 14–1–36.1(a) cloaked a Family Court justice with broad discretion to release a delinquent or wayward juvenile from the Training School.[12] Moreover, § 14–1–36.1(b) allowed for "[a] child so sentenced" to be placed in a TCP. In 2008, the General Assembly amended subsection (a) of § 14–1–36.1 to require the Family Court justice to make more stringent findings before releasing a delinquent or wayward youth who had been sentenced to the Training School. P.L. 2008, ch. 9, art. 12, § 2. Furthermore, as a prophylactic measure against any ambiguity, the General Assembly included within subsection (a) an explicit reaffirmation that § 14–1–42 exclusively governs the release of certified juveniles. P.L. 2008, ch. 9, art. 12, § 2.

It is within the context of the statute's evolution that we analyze the current language. The first paragraph of subsection (a) begins "[n]o child sentenced to the training school for youth, after being found delinquent or wayward * * *." Section 14–1–36.1. It is clear that the remainder of the subsection's language applies only to the release of children who satisfy two independent conditions: (1) that they have been sentenced to the Training School and (2) that they have been adjudicated delinquent or wayward. The General Assembly's 2008 amendment to subsection (a) added new language that applies to a second category of juveniles who have been (1) sentenced to the Training School and (2) certified under § 14–1–7.3.

Significantly, the pre–2008 version of subsection (b) in § 14–1–36.1 begins merely, "[a] child so sentenced." Rather than explicitly referring to a child who meets both conditions of a sentence to the Training School and an adjudication of delinquency or waywardness, the General Assembly chose the more general language of

11. Section 14–1–36.1, as amended by P.L. 2008, ch. 9, art. 17, § 10 provides:

"(a) No child sentenced to the training school for youth, after being found delinquent or wayward, shall be released prior to the end of his or her sentence unless authorized by a justice of the family court, after a hearing with due notice to the parties to the petition upon which the child was sentenced. At any such hearing, the family court shall authorize the release of the child to his or her home and/or to the care and custody of the department of children, youth and families unless the court finds that the child:

"(1) Poses a substantial risk of harm to self; or

"(2) Poses a substantial risk of harm to others; or

"(3) Has demonstrated that he or she may leave the jurisdiction of the court.

"Provided, however, any child who has been certified and adjudicated pursuant to §§ 14–1–7.2 and 14–1–7.3, may not be re-

leased prior to the end of his or her sentence, except as authorized under § 14–1–42 of this chapter.

"(b) A child so sentenced may be allowed as part of a rehabilitation program to be placed temporarily in a community program outside of the training school only when authorized by the family court."

12. Section 14–1–36.1, as enacted by P.L. 1990, ch. 430, § 1 provided:

"(a) No child sentenced to the training school for youth, after being found delinquent or wayward, shall be released prior to the end of his or her sentence unless authorized by a justice of the family court, after a hearing with due notice to the parties to the petition upon which the child was sentenced.

"(b) A child so sentenced may be allowed as part of a rehabilitation program to be placed temporarily in a community program outside of the training school only when authorized by the family court."

"[a] child so sentenced." Moreover, when it amended § 14–1–36.1, the General Assembly preserved this broader language. The General Assembly could have distinguished delinquent or wayward juveniles from certified juveniles as it did in subsection (a), but it made no such distinction. We therefore construe the predicate in subsection (b), "[a] child so sentenced," to refer to any child sentenced to the Training School for youth, whether by adjudication of waywardness or delinquency or after certification and subsequent conviction. Accordingly, reading § 14–1–7.3(a) together with § 14–1–36.1(b), we conclude that the General Assembly intended to vest the Family Court with broad authority to order a TCP for children sentenced to the Training School, even when they have been certified.[13]

Finally, the state argues that such an interpretation of the statute would be inconsistent with the policy aims underpinning the certification statute. It invokes the painful memory, discussed in our opinion in *Rock v. State*, 681 A.2d 901 (R.I. 1996), of the rape and murder of a seventeen-year-old female by an eighteen-year-old male who had been sentenced to the Training School pursuant to a delinquency adjudication after he raped and attempted to murder a twelve-year-old girl. *Id.* at 905–06. The state emphasizes that this horrific crime occurred while the delinquent juvenile was enrolled in a private vocational school as a TCP. We are very much aware that the public's perception that the juvenile system was overly lenient toward young offenders was the impetus behind the General Assembly's creation of the certification process in 1990. *See* John J. Cloherty III, Note, *The Serious Juvenile Offender in the Adult Criminal System: The Jurisprudence of Rhode Island's Waiver and Certification Procedures*, 26 Suffolk U.L.Rev. 407, 407, 424–25 (1992) (discussing public outcry when thirteen-year-old Craig Price murdered a neighbor and then, at age fifteen, brutally slaughtered a mother and her two children, but received only the maximum allowable sentence of detention at the Training School until age twenty-one).

This Court recognizes and appreciates the state's obligation to protect the public from dangerous juveniles. Although "the best interests of the child" ordinarily is the lodestar in Family Court matters, we have long recognized the need "to strike a balance between the desirability of rehabilitating the offending child on the one hand and the need to protect the security of the community on the other." *Knott v. Langlois*, 102 R.I. 517, 527, 231 A.2d 767, 772 (1967). The certification statute plainly represents the General Assembly's recognition of these different and, at times, conflicting policy aims by explicitly requiring a Family Court justice not only to find by a preponderance of the evidence that the child likely has committed the offense charged but also that (1) "[t]he child's past history of offenses, history of treatment, or the heinous or premeditated nature of the offense is such that the court finds the interests of society or the protection of the public necessitate the certification" and (2) "[t]he jurisdiction of the court but for the exercise of certification is in all likelihood an insufficient period of time in which to accomplish a rehabilitation of the child." Section 14–1–7.2(a)(2)(3).[14] The require-

---

**13.** Although perhaps the word "appropriate" in G.L. 1956 § 14–1–6.2 engenders some ambiguity, we are further buoyed in our interpretation by the General Assembly's 2007 requirement (P.L. 2007, ch. 532, § 2) that the Family Court justice in all cases "consider placing the juvenile in the least restrictive appropriate facility or program."

**14.** *See* Laureen D'Ambra, *Legal Response to Juvenile Crime: Why Waiver of Juvenile Of-*

ment for those findings ensures that certification is reserved for those juveniles whose crimes are sufficiently serious that a transition to a more balanced approach of punishment is appropriate, even though the overarching goal of rehabilitation is not abandoned. The General Assembly has elected, as a matter of policy, to hold out hope for the rehabilitation of certified juveniles. In this case, the Family Court justice has made factual findings that Ocean Tides would provide Harrison with "the best opportunity to rehabilitate himself," findings that the state conspicuously has not challenged. We conclude that the TCP of a certified youth is not plainly inconsistent with the policy aims of the certification statute and, therefore, hold that a justice of the Family Court is cloaked with the authority to temporarily place a certified juvenile at a facility in the community, such as Ocean Tides.

## IV

### Conclusion

For the reasons set forth in this opinion, the order of the Family Court is affirmed. The papers of the case shall be remanded thereto.

Justice GOLDBERG, concurring.

I concur in the well-reasoned opinion of the majority in this case, but I write sepa-

*fenders is Not a Panacea,* 2 Roger Williams U.L.Rev. 277, 291 (1997),

"In keeping with the national trend, Rhode Island law has shifted away from its previous rehabilitative emphasis by expanding legal provisions for treating juveniles as adults. * * * Certification retains rehabilitation as a goal, but as a mechanism for long-term 'adult' sentences, it is not generally in the child's best interest. In addition, automatic certification of repeat offenders over age sixteen creates an irrebuttable presumption that these offenders are unlikely to be rehabilitated. Finally, certification also may result in reverse effects on punish-

rately because of the manner in which this case was "adjudicated" in the Family Court. The offender in this case, Paul Harrison (Harrison), was certified, in accordance with G.L. 1956 § 14–1–7.3(a)(2), and pled *nolo contendere* to first-degree sexual assault by force and coercion. According to the papers filed in this Court, it was "the particularly egregious and depraved nature of the first degree sexual assault committed by [Harrison] upon a sixteen year-old female victim, that prompted the Attorney General to move that [he] be certified[.]" [15] Harrison was convicted of a serious felony and sentenced to fifteen years at the Adult Correctional Institutions, five years to serve (after the period of his minority was served at the Rhode Island Training School), followed by a ten-year suspended sentence and probation.

As is customary during the course of an adversary proceeding, this disposition was the result of a negotiated plea in which the state agreed to withdraw its petition for a waiver of Family Court jurisdiction over Harrison in exchange for certification in accordance with § 14–1–7.3 and a term of incarceration beyond Harrison's minority. Negotiated plea dispositions are part of the foundation upon which our system of criminal justice rests. However, as the travel of this case demonstrates, adher-

ment, if the family court imposes harsher sentences than the superior court."

**15.** This statement is contained in the state's memorandum in support of its petition for a writ of certiorari and stay of the order of transfer. We are confronted with a scant record of the facts underlying this serious felony crime. However, the juvenile sex offender evaluation report that was ordered by the Family Court and prepared by a clinical social worker set forth the factual allegations of this sexual assault; suffice it to say, this was a serious felony.

ence to these principles and even a basic understanding of the law as it relates to certification of juvenile offenders painfully was absent in this case.

Six months after the plea, during Harrison's first review before the Family Court, the chief judge of that court, *sua sponte*, ordered Harrison transferred from the Training School, where he was midway through a rehabilitation program, and placed in temporary community placement. Although the suitability and efficacy of Ocean Tides and its rehabilitative programs for the state's youth, including those who have been certified in accordance with § 14–1–7.3, is well known and unquestioned, the manner in which this order was issued, without regard to the parties (and the young victim), was inappropriate. Significantly, neither party sought nor asked for the issuance of this extraordinary relief, it was issued by a jurist who, the record reflects, appears to have had no understanding of the nature of the charge or the legal significance of statutory certification. *See Direct Action for Rights and Equality v. Gannon,* 713 A.2d 218, 225 (R.I.1998) (stating that it is inappropriate for a trial justice to award a party relief that the party has not requested).

At the review proceeding, the chief judge was informed that Harrison had been sentenced in June 2008, that he had obtained a GED, completed substance-abuse counseling, and was progressing in the sex-offender unit of the Training School. According to the prosecutor, Harrison was in the beginning stages of treatment and eventually could be transitioned into a step-down program, but the prosecutor added that the Training School was "not willing to transition him at this time." Significantly, Harrison's lawyer asked for another review date in a few months. The Training School representative recom-

mended a remand to that facility and suggested that a step-down program would be possible at some future time. Among the possible step-down options discussed were "Communities for People" or "Turning the Corner." However, the tenor of the proceeding changed when defense counsel indicated that Harrison had been accepted at Ocean Tides before the plea in this case. The following colloquy occurred:

> "The Court: Ocean Tides said they'd take him?
>
> "[Defense Counsel]: That was back in May, Your Honor [before the disposition].
>
> "The Court: What's the alleged offense? Tell me what it was. What happened?
>
> "[Prosecutor]: In this offense? Yes, Your Honor. It was first degree sexual assault.
>
> "The Court: Tell me what it was.
>
> "[Prosecutor]: I believe it was alleged that he gave oral sex to a woman without her consent while she was saying no. I only read the facts briefly, Your Honor.
>
> "The Court: Ocean Tides, if they take him, he's placed there. Thank you very much.
>
> "[Prosecutor]: As of when, Your Honor?
>
> "The Court: Immediately. Henceforth.
>
> "[Prosecutor]: Your Honor, the [T]raining [S]chool is recommending remand.
>
> "The Court: I don't care what the [T]raining [S]chool recommends. I'm the boss here. If Ocean Tides will take him, he is to go."

The trial justice made no findings relative to whether Ocean Tides was appropriate and no findings with respect to Harrison or the nature of the crime; he summarily ordered that Harrison be transferred forthwith. His only colloquy with Harrison was the following:

"The Court: Young man, you're doing very well. That's why I gave you a break, you understand?

"[Harrison]: Thank you, sir."

Four days later, on January 16, 2009, the chief judge again took up this case. The state filed a motion to reconsider placement at Ocean Tides, based on the fact that Harrison had been certified and stood convicted of a felony. According to the prosecutor, Harrison had been certified by the Family Court based on the fact that he was incarcerated "on a pretty bad first degree sexual assault." The motion to reconsider was denied again, without findings or explanation.

Five days later, on January 21, 2009, the parties again appeared before the chief judge. As is required by Article I, Rule 8 of the Supreme Court Rules of Appellate Procedure, a party must first seek a stay of an order in the lower court before this Court will entertain such a request. Although the prosecutor indicated that the state intended to seek review in the Supreme Court, the chief judge refused to decide the motion for a stay. After entertaining arguments from counsel both for and against the issuance of a stay, the following colloquy ensued:

"The Court: What's the sentence here, AG?

"[Prosecutor]: The sentence?

"The Court: Yes.

"[Prosecutor]: Five years to serve. It was a 15–year sentence with five years to serve, [Y] our Honor.

"The Court: I can suspend that, can I not?

"[Prosecutor]: You can, [Y]our Honor. But under 14–1–41(c), there's specific guidelines you're required to meet in order to modify his certified sentence.

"The Court: I can suspend the sentence without guidelines, can I not?

"[Prosecutor]: Your Honor, he's technically not eligible under the statute for a modification and suspension of his sentence.

"The Court: Why isn't he?

"[Prosecutor]: Because the statute sets out that there must be a hearing 30 days prior to either his eighteenth birthday or the one-year anniversary of his sentence, whichever is greater, and neither of those points [has] been met at this point. That will occur in, I believe, August of 2009.

"[Defense Counsel]: You haven't modified his sentence. A modification requires findings and requires the sentence be suspended. You're not suspending the sentence.

"The Court: It's a TCP.

"[Defense Counsel]: This is exactly what you're allowed to do under 14–1–7.3(a)2, which says you can send him to the Training School in a facility designated by the Court.

"The Court: Okay. The Court will reserve its decision. Thank you very much.

"[Defense Counsel]: Thank you, [Y]our Honor.

"[Prosecutor]: Your Honor, can you just clarify that for me?

"The Court: Yeah. I reserve my decision. I'll give you a decision some other day.

"[Prosecutor]: Your Honor, we have a motion pending in the Supreme Court.

"The Court: Young lady, did you hear what my decision was? I'm reserving the decision in this case. I may want to look at the memorandums. I may want to look at the law. If you want to be fresh, young lady, go right ahead. Thank you very much.

"[Prosecutor]: Can we have a date, [Y]our Honor, for the decision?

"The Court: No. I'll give you a decision when I'm ready."

Later that day, the duty justice of this Court issued a temporary stay of Harrison's transfer to Ocean Tides and, on February 5, 2009, this Court granted the state's petition for a writ of certiorari, concluding that the chief judge's ruling was not sustainable on the record before us. This Court noted that the record did not support the requisite factual and legal underpinnings for a transfer to community placement. We stayed the order and directed the Family Court to conduct an evidentiary hearing and issue a new decision containing the necessary findings of fact and rulings of law sufficient to support the decision and allow for appellate review.

Shortly thereafter, an evidentiary hearing was held and a written decision ordering Harrison to community placement at Ocean Tides was produced. On March 12, 2009, this Court granted the state's amended petition for writ of certiorari. Although Harrison was transferred to Ocean Tides, this Court directed that "the respondent shall be confined to the Ocean Tides premises and will not be eligible for any week-end passes or any other release." Save for travel to medical appointments, Harrison has been confined to the premises at Ocean Tides for more than a year.

The manner in which this case was handled is of concern; neither justice nor any party was served by the autocratic rulings of the trial justice. Harrison was removed from a rehabilitation program in which he was progressing and then confined to Ocean Tides for over a year because of the dearth of findings and summary rulings by the chief judge. Further, the state was prejudiced because within six months of reaching a negotiated plea disposition in a violent case, the state was confronted with a *sua sponte* order of community placement for this serious crime. The record discloses that the trial justice had no understanding of the offense to which Harrison pled, nor of the egregious circumstances under which it was committed. Additionally, he displayed a fundamental misunderstanding of the certification process and result.

The Family Court long has enjoyed a reputation for cutting-edge rehabilitative programs for youthful offenders, and its justices are among the most respected jurists in this state. However, that tradition was not reflected in this case. Hopefully what occurred in this instance will not be repeated.

Justice Indeglia took no part in the consideration or decision of this appeal.